[No. G047627. Fourth Dist., Div. Three. Feb. 22, 2013.]

FABIAN L., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in
Interest.

**COUNSEL**

Michelle Jarvis for Petitioner.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

Rebecca N. Captain for Minor.

OPINION

**O'LEARY, P. J.**—Fabian L. (Father) challenges the termination of reunification services at the six-month review hearing, regarding his three-year-old daughter A.L. He asserts there was insufficient evidence to support the juvenile court's finding that as an incarcerated parent he failed to make substantive progress in his court-ordered treatment plan and the court abused its discretion in terminating reunification services. Finding his arguments lack merit, we deny his writ petition.

I

On February 27, 2012, two-year-old A.L. was taken into protective custody after her paternal great-grandmother and paternal grandmother took the child to a hospital. Orange County Social Services Agency (SSA) filed a petition alleging A.L. fell within the provisions of Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1] The hospital staff reported the child was in an "unkempt condition," having an odor and redness in her vaginal area. They observed A.L. had numerous bruises and scratches to her face. She was diagnosed as having a urinary tract infection. The child's 22-year-old mother (Mother) was unable to provide a reasonable explanation for A.L.'s physical condition.

The petition stated Mother, while under the influence of methamphetamine, was the child's primary custodian. On numerous occasions, Mother left A.L. without adequate supervision, allowing A.L.'s three-year-old cousin to fight with and injure A.L. Mother failed to provide A.L. with adequate medical care, including immunizations. Mother had an unresolved history of substance abuse and domestic violence with Father. In May 2010, she was granted a temporary restraining order against Father due to allegations of domestic violence. Mother was fearful Father would kidnap A.L.

The petition alleged 23-year-old Father also had an unresolved history of substance abuse, unresolved anger management problems, and a criminal history dating back to his teens. The offenses included robbery, possession of a controlled substance, carrying a concealed weapon, and multiple counts of participating in a criminal street gang. Father was incarcerated in Yucaipa.

The paternal grandmother stated she and the paternal great-grandmother picked up the child every Friday and returned her sometime the following

---

[1] All further statutory references are to the Welfare and Institutions Code.

week. They took her to the hospital after they picked her up for a visit and found her soiled, unkempt, dirty, and smelly. The paternal grandmother told the social worker Father had been in prison for two years for tagging and gang association. She believed he was due to be released in one and one-half years. When Mother gave her permission, the paternal relatives took A.L. to visit Father.

A.L. lived with the paternal grandmother for the first part of her life. This arrangement ended when the paternal great-grandmother discovered Mother had been stealing from her. Mother kept the child from the paternal relatives for about eight months, but for the past few months she had permitted them to take the child on weekends. The paternal relatives stated the child was always dirty and injured when they visited her. The paternal grandmother stated A.L. told her the bruise under her eye occurred when Mother punched her. The paternal grandmother stated Mother's parents were also drug addicts.

A.L. was placed with her maternal great-aunt. At the detention hearing, the court found Father to be A.L.'s presumed father. On March 13, 2012, a social worker sent an "incarcerated parent's packet" to Father. The packet included blank paper, addressed, postage paid envelopes, a suggested reading list, and two chapters from a parenting handbook. The social worker advised Father to attend parent education classes and any counseling services available at the prison.

In April 2012, the social worker interviewed Father at Oak Glen Conservation Camp in Yucaipa. He denied Mother's allegations of domestic violence. Father stated he stopped smoking methamphetamine when he turned 18, but he still drank occasionally. He denied being involved with a gang anymore. He stated that during A.L.'s last visit, she knew who her daddy was. He wanted the paternal relatives to be given as many visits as possible and he requested A.L. be placed with the paternal great-grandmother because A.L. was close to her. He stated the paternal relatives would transport her to the jail for visits. He wanted A.L. to live with him when he was released.

Father told the social worker his mother abused drugs and physically abused him. As a child, he was removed from his mother's care on two occasions and placed with the paternal great-grandmother. Father met Mother when he was 15, and they married in 2009. Father stated he was going to divorce her because she lied and did not remain faithful. Father was arrested in June 2010, for placing graffiti on a federal building. He was sentenced to four years eight months because the offense was his second strike.

In her April 2012 report, the social worker changed her recommendation for Father from reunification to no reunification services. Her recommendation was based on Father's admission that in 2010 he was sentenced to four

years in prison, which meant he would be incarcerated for one more year, and A.L. was two years old at the time of detention. The social worker stated the parent/child bond could not be very strong because Father had been incarcerated for most of A.L.'s young life.

In addition, the social worker opined the prognosis for this family was poor. "It is unfortunate that both [Mother] and [Father] . . . were both foster children at one time and the cycle has continued. [Mother] seems too young and immature to fully appreciate the meaning of being a responsible mother and has emotional issues . . . . [Father] stated that he was deeply involved with gangs, but is no longer involved with them. The undersigned has no way of knowing [if this is true], but at the time of his gang involvement, [Father] was not considering the fact that he was married and had a child. [Father] is also young and has emotional issues from his past, but this is not the child's fault and the child deserves a permanent home, free of drug abuse and gang violence."

On April 16, 2012, the court found the petition to be true and ordered SSA to provide reunification services to Mother and Father. Father's case plan required him to participate in counseling upon his release from prison. While incarcerated, Father was to participate in any available inmate service programs to facilitate reunification, including drug treatment, parent education, vocational training, and counseling.

Before the six-month review hearing, a different social worker prepared a report in October 2012 recommending the continuation of reunification services. A.L. was still placed with her maternal great-aunt, where she was happy and thriving. The social worker reported Mother was living with her fiancé and they were expecting a child. Mother admitted she had not complied with the terms of her reunification plan, except for visiting A.L. Mother indicated she had concerns about the paternal relatives' visits with A.L., and she requested they be monitored.

The social worker noted Father was still incarcerated at the camp, where he was working as a firefighter. He had maintained regular contact with the social worker in writing and by telephone, expressing his commitment to A.L. Father had also written to A.L. and was working hard to remain connected with the child. He expected to be released at the end of 2013. The social worker opined Father was receiving good vocational training as a firefighter, but the camp did not offer other services such as counseling or parenting classes. She said Father had studied the information given to him about child development and parenting, and he reported the information was very helpful. Father stated he was saving the small salary he received for working as a firefighter to provide for A.L. He intended to be a part of A.L.'s life, and his

family would provide him with a great support system upon his release to facilitate their reunification.

The social worker mailed Father additional stamped envelopes because he had consistently remained in contact with the social worker and A.L. She also sent him a book on parenting by the Boys Town organization. Father reported the materials were helpful, and he requested more literature on child development and parenting. A.L. visited Father once a month. The social worker concluded Father's cooperation with the case plan had been substantial, but qualified this by also stating Father had "substantial compliance with visitation, although limited participation in services due to being incarcerated."

The six-month review hearing was continued to November 2012. The social worker prepared an addendum report on November 1, 2012, changing her recommendation. She suggested the court terminate reunification services and schedule a permanency hearing under section 366.26 (hereafter .26 hearing).

In her report, the social worker did not explain the specific reason for the change of recommendation, but rather reported on the following series of facts. Father had called the social worker to reiterate his desire to reunify with A.L. when he was released at the end of 2013. Father stated he would like to receive more reunification services. The following day, the social worker spoke to Mother, who relinquished her parental rights. Mother indicated she would like the maternal great-aunt to adopt A.L. Mother did not want the paternal relatives to have contact with A.L.

The paternal grandmother told the social worker she would like more visits with A.L. She stated Father was scheduled to be released in August 2013, but it could be sooner due to good behavior. The social worker opined Father and the paternal relatives had expressed a great deal of love for A.L., and they were interested in being involved in her life. Father often wrote to the social worker about his hopes to reunify with A.L.

The social worker also noted A.L. was a happy, well-adjusted, three-year-old girl. A.L. appeared to be loved and well cared for by the maternal great-aunt and her husband. They were interested in adopting her.

The court held a contested six-month review hearing on November 1, 2012. Counsel presented argument on whether Father had made substantial progress with his case plan. Father's counsel noted the parties' stipulation contained the finding Father made "substantial progress" with his reunification plan. Father requested visitation be extended from one hour to three hours with A.L. Minor's counsel stated the finding of substantial progress

was based on a social worker's prior report and it was erroneous, because, "Father hasn't complied with any one component of his case plan besides visitation."

Counsel for SSA joined in the statements made by minor's counsel. She added Father had certainly acquired job skills as a firefighter while in custody, and he had been visiting A.L., but there was no evidence the child could be returned to his care in six months because he would still be incarcerated. Because the case was moving towards a .26 hearing, SSA did not believe an increase in visitation would be appropriate.

Before ruling, the court asked Father's counsel to point to specific evidence in the record on which there could be a finding of substantial progress with the case plan. Counsel pointed to Father's training as a firefighter, his efforts to become a better man, his consistent contact and commitment to A.L., his correspondence with the social worker, his demonstration of taking responsibility, and his self-study of parenting and child development. Father's counsel stated the social worker's finding of substantial compliance was based on Father's extraordinary efforts in light of the limited resources available.

The court stated that after looking at the list of causes necessitating A.L.'s placement, the finding of substantial progress must relate to Father's efforts to alleviate or mitigate those specific issues. The court reasoned Father's actual progress with respect to the original problems (of drug usage and violence) was minimal. The court modified the stipulated proposed orders and findings by striking "substantial" and checking the box titled "minimal." The court terminated reunification services and scheduled a .26 hearing for February 25, 2013.

## II

Father timely filed a petition for writ of mandate (Cal. Rules of Court, rule 8.452), challenging the court's factual findings for lack of substantial evidence. Father asserts he did all that he could do while incarcerated. He contends the only reason the social worker changed her recommendation regarding his services was because Mother decided to relinquish her parental rights. We find the court's order is supported by substantial evidence and the court did not abuse its discretion in discontinuing Father's reunification services.

### A. *Applicable Law*

 " '[F]amily preservation is the first priority when dependency proceedings are commenced.' [Citation.] To that end, '[w]hen a child is removed

from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family.' [Citations.] [¶] In cases like the instant one, where the child is less than three years old and reunification services have been ordered, 'the court shall inform the parent or guardian that the failure of the parent or guardian to participate regularly in any court-ordered treatment programs or to cooperate or avail himself or herself of services provided as part of the child welfare services case plan *may result* in a termination of efforts to reunify the family after six months.' (§ 361.5, subd. (a)(3), italics added.) Whereas services are presumptively provided for 12 months to children over the age of three and their parents (§ 361.5, subd. (a)(1)), the presumptive rule for children under the age of three on the date of initial removal is that 'court-ordered services shall not exceed a period of six months from the date the child entered foster care' (§ 361.5, subd. (a)(2); see *In re Christina A.* (2001) 91 Cal.App.4th 1153, 1160–1161 [111 Cal.Rptr.2d 310]). The ' "unique developmental needs of infants and toddlers" ' [citation] justifies a greater emphasis on establishing permanency and stability earlier in the dependency process ' "in cases with a poor prognosis for family reunification" ' [citation]." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174–175 [83 Cal.Rptr.3d 864] (*M.V.*).)

■ "The status of every dependent child in foster care shall be reviewed periodically as determined by the court but no less frequently than once every six months . . . ." (§ 366, subd. (a)(1).) "The third paragraph of section 366.21, subdivision (e), requires a specialized inquiry at the six-month review for children like [A.L.], who are 'under the age of three years on the date of the initial removal' and are not being returned to the custody of their parents at that time. For such dependent children, if 'the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the *court may schedule a hearing pursuant to [s]ection 366.26* within 120 days. If, however, the court finds there is a *substantial probability that the child . . . may be returned* to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing.' (§ 366.21, subd. (e), italics added.)" (*M.V., supra*, 167 Cal.App.4th at p. 175.)

■ "Thus, there are two distinct determinations to be made by trial courts applying the third paragraph of section 366.21, subdivision (e). First, the statute identifies specific factual findings—failure to participate regularly and make substantive progress in the court-ordered treatment plan—that, if found by clear and convincing evidence, would *justify* the court in scheduling a .26 hearing to terminate parental rights. But this inquiry does not *require* the court to schedule a .26 hearing ('the court *may* schedule a hearing'). (§ 366.21, subd. (e), italics added; see *In re Jesse W.* (2007) 157 Cal.App.4th 49, 62 [68

Cal.Rptr.3d 435] ['The statute makes clear that the *court has discretion to set* a section 366.26 hearing at the six-month review hearing under specified circumstances . . . .' (italics added)].) Instead, it authorizes the court to set such a hearing if the required findings have been made." (*M.V., supra*, 167 Cal.App.4th at pp. 175–176.)

"The second determination called for by the third paragraph of section 366.21, subdivision (e), protects parents and guardians against premature .26 hearings. Notwithstanding any findings made pursuant to the first determination, the court shall not set a .26 hearing if it finds either (1) 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or (2) 'reasonable services have not been provided . . .' to the parent. (§ 366.21, subd. (e).) In other words, the court must continue the case to the 12-month review if it makes either of these findings. However, the court is not required to set a .26 hearing even if it finds against the parent on both of these findings. The parent is also entitled to continued reunification services (with any necessary modifications) if the court makes either of these findings in favor of the parent. [Citations.]" (*M.V., supra*, 167 Cal.App.4th at p. 176, fn. omitted.)

■ Reunification services for incarcerated parents are specifically governed by section 361.5, subdivision (e)(1), which provides, "the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." In determining the existence of detriment, the court is to consider several factors, "the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors." (*Ibid.*) In ordering services for incarcerated parents, the court must consider what is available to that parent: "In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated, institutionalized . . . parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan." (*Ibid.*) Thus, a parent may be required as part of his or her service plan to attend counseling, parenting classes, or vocational training programs if access to those services is provided.

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689 [120 Cal.Rptr.3d 549].)

B. *Analysis*

When two-year-old A.L. was taken into protective custody, Father was incarcerated. The trial court determined reunification services would not be detrimental to A.L. (§ 361.5) despite the social worker's initial recommendation Father not receive services because his minimum period of incarceration put him well beyond the six-month period (for a child under the age of three such as A.L.) to which reunification was limited. SSA changed its recommendation before the disposition hearing, and the court ordered services for both parents, adopting the social worker's case plan.

The services provided to Father as an incarcerated parent were reasonable, and Father does not allege the reunification case plan provided to him was unreasonable. The social worker sent him appropriate materials, and after investigating the services available in his institution, tailored a suitable case plan. As documented throughout the record, the "fire camp" offered excellent vocational training but could not offer Father any meaningful reunification-relevant resources. The social worker reported Father had no access to drug treatment, counseling, anger management (to address his issues with domestic violence), or a parenting class. But under section 361.5, Father was not expected to participate in services that were not available. It is undisputed that, as required by his specifically tailored case plan, Father took advantage of the vocational services offered, kept in consistent contact with the social worker and A.L., and engaged in a self-study course of parenting with materials supplied by the social worker. We conclude he substantially complied with the case plan offered to him. He clearly exhibited a strong commitment to his daughter regardless of the barriers he faced as an incarcerated parent. We commend him for making such a strong effort to turn his life around, away from a criminal gang lifestyle, and towards becoming a responsible and better man.

While Father's great strides in personal growth will certainly serve him well after his release from custody, it is simply not enough to compel reversal of the court's orders. Father's substantial compliance *with his case plan* must not be confused with the requirement a parent make substantial progress *towards reunification* with a three-year-old child within the statutorily prescribed time period of six months. The one finding does not automatically compel the other.

As reasonably determined by the juvenile court, there was no evidence Father made more than minimal progress with respect to alleviating or mitigating the problems that led to A.L.'s detention, namely drug abuse and domestic violence issues. The six-month review hearing was held over eight months after A.L.'s detention, two months past the statutorily prescribed

six-month reunification period for a child A.L.'s age. Unfortunately, Father's place of incarceration prevented him from addressing the serious problems that led to A.L.'s detention. Indeed, there is simply no evidence from which the court could reasonably conclude Father, following his release from prison in August 2013, could be able to safely care for A.L. while remaining sober, staying out of the gang, maintaining employment, and not engaging in domestic violence in front of A.L.

Simply stated, Father's case plan compliance, while commendable, was not enough to justify making A.L. wait any longer for the mere possibility of reunification with her father in the distant future. This conclusion goes to the heart of Father's appeal. How can substantial compliance with a reunification plan not be enough evidence to warrant an additional six months of reunification services? We can certainly appreciate Father's frustration because he did all that was asked of him (given the limitations presented by his incarceration). We can also understand why Father feels SSA is to blame for "setting him up for failure" given the unavailability at his camp of counseling and reunification-type programs he needed to reunify with A.L.

We believe it was ultimately the juvenile court's application of the statutory scheme that created these seemingly unfair circumstances. We appreciate there is ample and familiar case authority holding incarcerated parents must generally be provided reasonable services. (See *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402 [22 Cal.Rptr.2d 50] [" 'go to prison, lose your child . . .' " is not an appropriate legal maxim in most circumstances]; *In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1237–1238 [62 Cal.Rptr.2d 208] [distance of prison cannot be sole factor in denying services or visitation], disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541]; § 361.5, subd. (a)(3) [in determining reasonable services, court must take into consideration particular barriers to an incarcerated parent's access to services].)

■ As aptly noted by one treatise, Seiser and Kumli, California Juvenile Courts Practice and Procedure (2012) section 2.129[2][b], page 2-390 (hereafter Seiser), there is also a statutory provision authorizing courts to deny services to incarcerated parents and it is "one of the most underutilized dependency provisions." Section 361.5 recognizes that mandating services for incarcerated parents in some cases may be detrimental to the child. In deciding the issue of detriment, the court considers many factors, including the age of the child, the period of incarceration, the nature of the crime, the services offered in custody, and the likelihood of the parent's release within the reunification time limits. (§ 361.5, subd. (e)(1).)

We agree with and embrace Seiser's conclusion that "there are many cases in which the provision of . . . services has little or no likelihood of

success and thus only serves to delay stability for the child, particularly if the incarcerated parent is the only parent receiving services. This is especially true when the parent will be incarcerated longer than the maximum time periods for reunification efforts. It is also frequently true when the parent is incarcerated in a facility that has no services sufficient to help the parent work toward reunification and there is no reasonable way to provide services to that parent. Indeed, *to attempt services in such circumstances may be setting everyone up for failure, including the parent, agency, and child.* Thus, in cases such as these, it may be possible to show that providing services to the incarcerated parent would be detrimental to the child since it would delay permanency with no likelihood of success. ▇ Juvenile courts and attorneys for social services agencies and children should carefully consider the question of whether providing services to an incarcerated parent would be detrimental to the child and should utilize this provision to deny services when appropriate." (Seiser, *supra*, § 2.129[2][b], pp. 2-390 to 2-391, italics added.)

This statutory provision should have been applied in this case. For reasons not clearly apparent in this record, SSA withdrew its recommendation to deny Father services, and the court approved the proposed case plan for both parents. Of course this ruling cannot be reviewed in this appeal at this late date, but the error necessarily affects our consideration of the court's decision at the six-month review hearing (held pursuant to § 366.21) denying Father *additional* reunification services. Moreover, we hope pointing out the error will serve to remind the court and attorneys to carefully consider in future cases whether providing services to an incarcerated parent will cause detriment to the child (and merely serve to disappoint the parent).

▇ Returning to the issue at hand in this appeal, we hold that despite Father's substantial compliance with his case plan, the trial court did not abuse its discretion in denying further reunification services and scheduling the .26 hearing. Section 366.21, subdivision (e), does not compel the court to order additional reunification services simply because a parent makes substantial progress with the court-ordered treatment plan. Moreover, the provision gives the juvenile court discretion to schedule a .26 hearing, unless there is a substantial probability the child will be returned to his or her parent in six months or if there was evidence of unreasonable services. (§ 366.21, subd. (e).) Neither delaying event occurred in this case.

First, there was no substantial probability A.L. would be returned to Father in six months. Father was not scheduled to be released until August 2013, after which he could *start* reunification-related services. And at that point, A.L. will have been waiting in the dependency system for nearly 18 months without a permanent placement. Eighteen months is the outside time limit for all children in the system absent extraordinary circumstances not

present in this case. (§ 361.5, subd. (a)(3) [notwithstanding § 361.5, subd. (a)(1)(B), limiting reunification services to a parent of a child under the age of three to 12 months "court-ordered services may be extended up to a maximum time period not to exceed 18 months . . ."].)

Second, the services SSA provided were not unreasonable. As noted earlier, the service plan provided for Father reasonably complied with the statutory scheme for incarcerated parents. The plan appropriately took into consideration "the particular barriers . . . [and Father's limited] access to those court-mandated services and ability to maintain contact with his or her child." (§ 361.5, subd. (e)(1).) Father's case plan was the best it could be given his location and the length of his prison sentence. Father, not SSA, created these circumstances. He engaged in criminal activity as a teenager and later participated in gang activity knowing he had a child to provide for and protect. He took part in a firefighting program in prison that provided good future job prospects but did not offer any reunification-related services. He was located in a facility so far away from A.L. that she could only visit him once a month for one hour and their communication was limited to his letters to her. In light of the above, Father's writ petition lacks merit.

### III

The writ petition is denied.

Bedsworth, J., and Aronson, J., concurred.

A petition for a rehearing was denied February 27, 2013, and on March 26, 2013, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied June 26, 2013, S210220.