Filed 10/29/13  R.S. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| R.S.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF HUMBOLDT COUNTY,<br><br>        Respondent;<br><br>HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,<br><br>        Real Parties in Interest. | A139592<br><br>(Humboldt County<br>Super. Ct. No. JV120212) |

INTRODUCTION

R.S. (Mother) seeks writ review of an order terminating reunification services at the conclusion of the six-month review hearing for her infant daughter and setting of a Welfare and Institutions Code section 366.26 hearing.  (Cal. Rules of Court, rule 8.452; Welf. & Inst. Code, § 366.26.)[1][2]  Mother asserts the court erred in denying her six more months of reunification services as there was a substantial probability that the child would be returned safely within the extended services period.  She further contends the court erred in finding the Humboldt County Department of Health and Human Services

---

[1]  Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code and all rule references are to the California Rules of Court.

[2]  The father has not challenged that order.

1

(the department) provided reasonable services. We shall conclude these contentions are without merit and shall deny this writ petition.

## BACKGROUND

### A. *Detention, Jurisdiction and Disposition*

Less than a week after her birth, the child was removed from her parents, who were engaged in repeated incidents of domestic violence and had mental health issues. The child was placed with a local family foster home. On December 12, 2012, the court took jurisdiction over the child under section 300, subdivisions (b) and (j), finding under subdivision (b) that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the willful or negligent failure of the child's parent . . . to supervise or protect the child adequately from the conduct of the custodian with whom the child has been left" and "by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

As regards Mother, the court found true the facts supporting the jurisdiction finding: "On or about 11/18/2012, the mother, [R.S.] was arrested for [Penal Code, section 273.5] following an incident of domestic violence in which both parents suffered some minor injuries.[3] Following the birth of [the child], the hospital reported that the mother and father . . . argued. The inability of the mother to refrain from arguing and domestic violence around the baby presents a risk of injury to the child. [¶] On or about 11/19/2012, the mother advised [social worker] Luenebrink that the father had punched her in the head while she was breast feeding. The mother also stated that the father had 'cracked my head open' during an incident of domestic violence two years ago (2010). The inability of the father to refrain from arguing and domestic violence around the baby presents a risk of injury to the child." [¶] . . . [¶] The mother has been described as displaying symptoms of post partum depression. The mother's actions in engaging in domestic violence with the father and in not being able to control her behavior place the

---

[3] This arrest occurred less than a week after the child was born.

2

child at risk." The court further found true the section 300, subdivision (j) allegations of the petition: "The child's sibling has been abused or neglected as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." "The mother received Family Preservation Services between 12/14/2004 and 05/17/2005 regarding her older son . . . . The mother received Family Reunification Services regarding [her older son] between 7/13/2005 and 3/12/2007 from both Alameda County and Humboldt County Child Welfare Services. The mother's parental rights to [her older son] were terminated on or about 8/13/2007. The mother failed to engage in services and to find appropriate housing for herself and her son. The father of [her son] had both substance abuse and mental health issues. The failure of the mother to engage in services and reunify with her older son presents a risk to this child." Although Mother had failed to reunify with her older son, the department recommended reunification services in this instance, as the Mother had been very young at the time of the prior dependency and her older son had been medically fragile, with life-threatening health issues. In this case, Mother had been visiting the infant regularly and was engaged in case planning with social worker Laurie Maldonado.

On January 8, 2013, the court adopted the recommended disposition findings and orders as modified and the modified case plan. The court declared the child a dependent, ordered family reunification services to mother and father, and set a six month review hearing for July 2, 2013.

**B.** *Case Plan*

Mother's initial case plan required her to: 1) Develop positive support systems with friends and family; 2) protect the child from emotional harm; 3) obtain and maintain a stable and suitable residence for herself and the child; 4) attend school on a regular basis until graduation or GED; 5) comply with medical or psychological treatment, including participation in and completion of a complete psychological evaluation and parenting assessment. Mother was also to follow all recommendations made by the therapist and to complete a parenting class approved by the department; 6) stay free from illegal drugs and show her ability to live free from drug dependency and comply with all

3

drug tests. Should mother test positive for illegal or non-prescribed substances she was to participate in an assessment through Humboldt County "Alcohol and other Drugs" and follow their recommendations. 7) Mother was also required to complete a victims' group at Humboldt Domestic Violence Shelter and to follow all recommendations made by the program.

## C. *Six Month Review*

A contested six- month review hearing was held August 14–15, 2013. Mother contended that the department had not provided reasonable services, in that the social worker did not return phone calls and did not provide meaningful assistance to Mother in completing her case plan. She further contended that her progress with her case plan was sufficient to support a finding that, if given additional services, there was a substantial likelihood that she would reunify during the next period of services.

**1.** *Status review report.* The status review report prepared by the department for the six month review, recommended reunification services be terminated as to both parents and that a section 366.26 hearing be set. The report stated that Mother failed to develop a positive support system and continued to engage with and stay with the father. Mother did not find stable housing for herself. She stayed temporarily with family and at times used her SSI money for short stays at local motels. Mother had smoked marijuana regularly since she was 12 years old. Although she had a prescription for marijuana to treat her severe anxiety, her use constituted abuse of that drug and she refused to seek psychological treatment for her mental health issues. Due to her anxiety and lack of follow through with mental health treatment, she was unable to participate in groups for parenting classes. In sum, Mother failed to address her mental health issues and failed to comply with her case plan. She was therefore unable to fully engage in services and failed to address the domestic violence in her relationship with the father. Mother failed to follow through with the recommendations resulting from the psychological evaluation and her mental health assessment. The status review report assessment concluded: "Although the parents did visit consistently and completed the court ordered psychological evaluations, they did not engage in the recommended services. There is no

4

substantial probability that the child may be returned to their care. The parents have not demonstrated the capacity and ability to complete the treatment plan objectives and provide for the child's safety, protection, physical and emotional well-being."

**2. *Services.*** Mother and the father were each provided four hours of separate supervised visitation each week. Both were consistent with their visits. At a visit on January 8, 2013, two visit supervisors (SSA's) smelled the strong odor of marijuana in the rest room at the Family Connection Center (FCC) after Mother came out of the rest room. Mother denied smoking marijuana in the rest room.

On January 11, social worker Maldonado met with Mother, explained her case plan, and made a list of the things Mother needed to complete. On January 18, Mother was given a letter summarizing her case plan requirements.

On January 14, Maldonado transported Mother to Humboldt Domestic Violence Services. Mother initially refused to meet with the counselor, but eventually agreed. Mother was provided information and offered support services by the counselor. On January 15, Carey, the client advocate from Humboldt Domestic Violence Services reported that Mother had agreed to a regular schedule of meetings and to support at her criminal court hearing on January 22. On February 2, Maldonado consulted with Carey, who reported that Mother had failed to stay in contact or to participate in domestic violence services. Carey also reported Mother had stated that there was no point to working her case plan as she was not going to get her baby back.

On February 14, the department provided transportation for Mother's psychological evaluation with psychologist Andrew G. Renouf. Dr. Renouf reported that mother exhibits mood symptoms of depression and anxiety, and psychotic symptoms of delusional paranoid belief. She also exhibited a maladaptive pattern of using marijuana that has likely resulted in physical tolerance and emotional dependence, interferes with her functioning, and is used despite prohibitions or in inappropriate circumstances. He reported Mother was severely impaired by her mental health problems and significantly impaired in her ability to function as a parent.

5

According to the psychological report: "For this assessment [Mother] evidenced a strong tendency to minimize or not report problems, and her accounts of events and circumstances were often confused and discrepant from the record. Because of these factors it was not possible to formulate specific diagnoses. It is quite clear from the totality of the data, however, that she is severely impaired due to mental health problems and has an extremely unhealthy relationship with her partner that puts her at risk for domestic violence as victim, perpetrator, or both. In addition, [Mother] abuses marijuana. Because of the lack of accurate information from her, it was not possible to determine if there are any benefits to her marijuana use in treating anxiety, or if it exacerbates or even causes her mental health problems." Dr. Renouf recommended mental health and drug treatment, and safe and stable housing. He also strongly recommended that Mother be evaluated for a trial of antipsychotic medication and abstinence from marijuana. He warned that a failure to follow these two specific recommendations would result in Mother's failure to follow her case plan. Once Mother became more stable, she would benefit from services to address domestic violence and parenting classes. Dr. Renouf recognized Mother's lack of insight and the father's influence were obstacles to her ability to access services and to comply with her case plan. He also noted that although she completed the initial interview, Mother left her first appointment early due to fatigue or stress and that during the entire two-hour meeting, the father paced outside the office building.

Dr. Renouf told Maldonado he had a conversation with Mother about his conclusions and concerns that she was a chronic marijuana smoker, that her abuse of that drug might be the cause of some of the psychoses and anxiety she was experiencing, and that medication might be compromised because of the marijuana smoking. Maldonado had sent the report prepared by Dr. Renouf to the court and to all the attorneys in the case, including Mother's attorney.

Mother failed to follow through on the recommendations of the psychologist for either a trial of psychotropic medication or abstinence from marijuana.

On February 15, Mother was arrested for battery against the father (Pen. Code, § 243, subd. (e)(1) [battery committed against a person who is the parent of the defendant's child].) Mother was incarcerated for three weeks before charges were dropped.

On March 29, Maldonado saw both parents and referred them to the Winter Shelter Program, contacting the person responsible for providing the service, but it was too late for the parents to come in. Maldonado then spoke with another provider who refused to provide assistance. Mother used the phone to call her sister in Fortuna and left a message. When Maldonado asked how they would get there, they said they had bikes and bus passes. They did not want help.

On April 23, Mother reported the father had been physically abusive to her earlier that day. Maldonado and social services aid Julie Tedesco observed bruises on Mother. Mother requested the department's assistance to get away from the father. Maldonado encouraged Mother to seek help from the domestic violence program and offered to take her there. Mother was overwhelmed and did not want to do that, so Maldonado assisted her in obtaining safe housing, by driving her to her sister's home and stopping at a fast food restaurant to get food as Mother had not eaten all day and was feeling sick. At that time, Maldonado spoke with Mother about Mother's desires for herself and her baby, about previous positive relationships and tried to educate Mother about the cycle of violence, trying to help her to understand the cycle. Maldonado also provided Mother with the phone numbers to Humboldt County Domestic Violence Services and to Mother's attorney, which Mother had previously been provided, but had lost. While Maldonado was taking care of Mother, there was an interaction with the father at the FCC that day. So the department arranged visitations for Mother and the child at the Mother's sister's home, so that Mother would not have to come to the FCC where the father likely would be circling and looking for her. The department had arranged separate visits for Mother and the father at FCC, because of a restraining order between the two and because of the history of domestic violence. Nevertheless, the father had come with Mother to almost every visit up to that point.

7

On April 29, Maldonado again provided Mother the phone numbers for Mother's attorney and for the domestic violence program because Mother said she had lost the card. Maldonado again encouraged Mother to contact them. She also let Mother know the appointment for the mental health assessment recommended by Dr. Renouf was coming up and that the department would be providing transportation.

On May 8, Mother completed a mental health assessment at County Mental Health Services. A mental health clinician signed Mother up for intervention services and completed a referral for Seeking Safety therapy group. Mother declined medication support. Mother was also scheduled for an appointment on May 31, to establish a primary care physician at Open Door Eureka. Mother failed to keep the appointment. She also failed to participate in any services at County Mental Health.

After requesting safe housing support, Mother failed to stay away from the father. They were seen together in the community by numerous department personnel.

The six-month review report listed services the department had provided Mother, including:

1. Referral to Humboldt County Domestic Violence Services for counseling;

2. Transportation by bus to services and visitation via bus tickets provided by the department;

3. Arrangements for supervised child visitation at the department for each parent in separate weekly sessions on a twice weekly basis;

4. Transportation of the child for visits by the substitute care provider;

5. Contact by the social worker with the parents to review their progress with their case plan and to address any problems they might be having in meeting case plan requirements;

6. Contact with the parents by the social worker to address domestic violence incidents and their resolution;

7. Regular contact by the social worker with the child's substitute care provider regarding the child's progress in their care and any special needs that may arise;

8.  Monthly contact by the social worker with the child to verify her well being and to resolve any new issues that might arise;

9.  Referral of the parents to County Mental Health Services for evaluation and treatment;

10.  Transportation by the Department to County Mental Health Services for evaluation and recommended services;

11.  Regular contact by the social worker with the public health nurse to determine health status and needs of the child;

12.  Regular staffing of the parents' case by the social worker and supervisor to review progress and to resolve problems;

13.  Contact with the parents' lawyers regarding the parents' progress with their case plan;

14.  Contact with the child's lawyer regarding the child's progress in placement and disposition recommendations;

15.  Social worker observation of parent-child interaction during supervised visitations;

16.  Preparation of court reports;

17.  Consultation with FCC staff regarding parents' interaction with their baby;

18.  Social worker's referral of Mother and the father to Humboldt County Mental Health for counseling, medication evaluation and any other relevant services;

19.  Social worker's referral  of Mother and the father to domestic violence prevention services;

20.  Social worker assistance in addressing a restraining order obtained by the father against Mother or ordered by the court for the protection of Mother;

21.  On-going case management;

22.  Social worker arrangement for the provision of visitation of relatives with the child;

23.   Provision of cell phones and minutes to Mother and the father;

24.   Social worker referral of Mother and the father to the Winter Shelter Program.

**3.** *Evidence at the six month review.* At the hearing on the six month review, held August 14–15, the court admitted the status review report into evidence, as well as the "Delivered Services Log," noting contacts and services provided from February 1, 2013 through July 31, 2013.

Mother testified that she had sufficiently complied with her case plan in that she had completed her psychological evaluation with Dr. Renouf  She asserted she never received a copy of that report and never reviewed the results of the report with the social worker. She had visited consistently. She does not drink or use drugs, except she previously used marijuana as a way to cope with her anxiety. Mother testified she had gone to a domestic violence class at Humboldt Domestic Violence Services on the previous Thursday and had enrolled in the class. People there had assisted her in getting into clean and sober housing the next day. A letter confirming her enrollment in the domestic violence class was admitted by the court.

Mother denied smoking marijuana in the rest room at the FCC during her visit in January. She stated she had spilled her coffee in the bathroom and when she came out there was smoke in the air and they accused her of smoking. She was upset that her baby and others would be exposed to the smoke. She stopped using marijuana shortly before her admission into clean and sober housing the previous Friday. Mother was somewhat unclear on when she ceased smoking marijuana, testifying variously that she had stopped smoking marijuana "[p]robably [on] August 7," so she could move into the clean and sober house; "three days before" August 7; and "Hmm . . . A little bit before—well, I— I'm not going to be smoking anymore. I'm going to go to anxiety groups instead of—I'm going to quit." She intended to begin going to anxiety groups. Mother also testified that her doctors were concerned about possible allergic reactions to anxiety medications. She could not recall the name of her doctor, but she had his card.

The social worker never asked Mother to drug test.

Mother testified that she had difficulties contacting Maldonado throughout her case plan period. She would call and receive no response or a response two weeks later. Upon Mother's release after spending three weeks in jail for domestic violence in

10

February, Maldonado told Mother "she wasn't going to help me . . . anymore." Mother could not recall where this conversation occurred, nor could she recall any explanation by Maldonado. Mother had called Maldonado asking for dates and times for domestic violence and parenting classes, but never got a response. She never received the January 18, 2013 letter outlining her case plan responsibilities until much later. Nor did Maldonado go over her plan responsibilities with her until much later. Mother testified she had been trying since the beginning of the dependency period to get into domestic violence classes, but Maldonado told her in January or February that they did not start until March. After Mother was incarcerated in February, Maldonado told her she would not help mother get into classes. Mother had enrolled herself in the domestic violence class and had obtained housing at a clean and sober home by calling the domestic violence hotline and without the department's assistance.

Mother testified she had left the father of the child after she realized she could no longer be around him. The domestic violence classes she had begun the previous Thursday had helped her realize she needed to get away from him, although she was new to the classes. She was intending to start a "Healthy Moms" parenting class, which she had found out about from the clean and sober house; not from the social worker. She thought the classes were on Wednesdays or Mondays and was planning to find out later that day. She had been trying since March to find out where the parenting classes were being held and how to get rides to them. Although she had talked with Maldonado at various times, the social worker would walk away from Mother before Mother was done talking or asking about services and would advise her to go talk to her lawyer. Mother acknowledged the department had provided her with three phones since January, but stated there were problems with them breaking.

In her testimony, social worker Maldonado contradicted Mother's assertion that she had been unavailable to Mother. According to Maldonado, she had not made a record of every contact with Mother in the services log, but she or her intern tended to see Mother or have contact with her a couple of times every month. Maldonado had received less than five—"maybe one or two"—phone messages from Mother during the time she

11

had been assigned to the case, despite Mother's acknowledging that she had been supplied three phones and minutes during the course of the dependency. Mother rarely, if ever, left her a message. Maldonado testified that during the time Mother was incarcerated, Maldonado was ill during part of the period. She then attempted to visit Mother at the jail, but did not have the proper clearance and was not able to see Mother. Then Mother was released. Maldonado and the social work intern, whom she directly supervised and who was assisting her on this case, gave the January 18 case plan letter to Mother on that date, during a meeting with Mother at the Child Welfare Office. During the month of May, Maldonado delegated responsibility for contact with Mother to her intern.

After the domestic violence incident between Mother and the father on April 23 at the Family Connection Center, visits were transferred for a time to Mother's sister's home, to which Mother was relocated. Visits were eventually transitioned back to the FCC. Maldonado had contact with Mother around June 14, when supervising a visit at the Family Connection Center. Mother never expressed needing assistance getting into a domestic violence group or for assistance with housing or mental health services. Nor did she indicate having a problem with her phone. Mother did ask for bus tickets, which were provided.

As recently as July 29, Maldonado spoke with Mother during and after her visit with the child. Maldonado was observing Mother's interaction with the child and noted that Mother was having a difficult time getting the fussy child to calm down. So Maldonado and Tedesco were supporting Mother and redirecting her with the child. When Maldonado asked Mother where she was staying and how she was doing, Mother was vague and stated "[i]n different places." Asked directly whether she was still staying with her sister, Mother responded that she would at times. Maldonado asked "Are you really staying somewhere? Because I don't want you sleeping on the streets. It's not safe." Mother said "No," that she had someplace to stay, but was vague and not forthcoming about exactly where she was staying. Maldonado spoke with Mother again about the domestic violence between Mother and the father, and the things Mother

needed to do to keep safe. Mother's response was "Well, I don't know. I don't know. I just kept thinking he was going to change." Mother asked Maldonado what was going to happen in the case and when told the department was recommending termination of services, Mother became very angry and began yelling, accusing Maldonado of having had her arrested and never wanting to help her and never doing anything to help her. At that point Maldonado walked away.

Maldonado flatly denied ever having told Mother that there was no point in doing this, as she was not going to get her baby back or that she should just give up. Rather, Mother had made comments on more than one occasion that she should just give up, which Maldonado attributed to Mother's feeling overwhelmed and a little depressed by the whole situation and which Maldonado believed was a normal feeling and understandable in the circumstances. Mother told Maldonado before the meeting with the domestic violence advocate on January 14, that "she didn't know why she was doing any of this because Child Welfare wasn't going to give her her baby back." Maldonado encouraged Mother at that point. The domestic violence advocate at Humboldt Domestic Violence Services informed Maldonado that during their meeting Mother again had said that there was no point to working her case plan; and that she was not going to get her baby back.

Maldonado also denied discouraging Mother from obtaining housing and stated that housing was one of the support services available through Humboldt Domestic Violence Services, the provider to which Maldonado had taken Mother in January.

Maldonado arranged transportation to appointments she had scheduled for Mother that were required by the case plan. She did not want Mother to worry about getting there by bus, so either Maldonado or the intern or an aid drove Mother. When Mother moved from her sister's Arcata home, sometime before February 14, she did not provide Maldonado with a change of address. Nor did she do so when she began staying with the father at the Quality Inn; nor when she stopped staying at the Quality Inn with the father. Mother had never provided information that she is living 80 miles away with her parents, nor had she ever indicated she needed assistance because she was living with her parents.

13

Acknowledging that Mother visited regularly with the child, Maldonado stated that the SSA's supervising visitation are trained in parenting strategies and that she and the SSA's talked about what strategies to use to assist Mother in interacting appropriately. Mother needed assistance and redirection during her visits. She needed direction and redirection about holding the baby properly, looking at the baby, talking to the baby, singing with the baby, doing age-appropriate activities and interactions with the baby, and feeding the baby. Although Maldonado and the SSAs provided parenting instruction throughout Mother's visitation, Mother did not demonstrate the understanding of age-appropriate development and her comments and interactions with the baby raised a concern about her ability to interact appropriately and care for the child.

Mother was also contacted by Karen Umberger of the department regarding Mother's enrolling in an Incredible Years parenting class that was to start on March 28 and to arrange Mother's transportation by the department to the class. Mother did not respond.

The first time Mother asked for assistance in getting back with Humboldt Domestic Violence Services was the week before the six-month review hearing when she left a phone message for Maldonado. Mother never expressed to Maldonado that Mother had difficulty working with her. The first time Mother told Maldonado that she was not helping Mother was at their July meeting, but she did not say what she needed help with that was not being provided.

Maldonado opined that although Mother had consistently visited her child and had completed the mental health assessment, as well as the psychological evaluation, that she "has not been able to follow through . . . on the recommendations or implement any changes or effect any changes in her behavior that would have a positive effect on her ability to parent her child safely."

At the conclusion of the six-month review hearing, the court terminated reunification services, finding by clear and convincing evidence that the department had made reasonable efforts to return the child to a safe home and to complete whatever steps were necessary to finalize a permanent plan for the child. The court also found that

14

although the parents had consistently and regularly visited with the child, they did not make significant progress in resolving the problems that led to the child's removal and did not demonstrate the capacity and ability to complete the treatment plan objectives and provide for the child's protection, and physical and emotional well-being. The court found Mother made no progress toward alleviating or mitigating the causes necessitating the placement out of the home. The court also found by a preponderance of the evidence that return of the child to the Mother created a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. It set the matter for a section 366.26 review hearing on December 11, 2013.

DISCUSSION

## I. Applicable Law

The recent case *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1026–1028 (*Fabian L.*), describes the applicable law in some detail, as follows:

" ' "[F]amily preservation is the first priority when dependency proceedings are commenced." [Citation.] To that end, "[w]hen a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family." [Citations.] [¶] In cases like the instant one, where the child is less than three years old and reunification services have been ordered, "the court shall inform the parent or guardian that the failure of the parent or guardian to participate regularly in any court-ordered treatment programs or to cooperate or avail himself or herself of services provided as part of the child welfare services case plan may result in a termination of efforts to reunify the family after six months." (§ 361.5, subd. (a)(3), [italics omitted].) Whereas services are presumptively provided for 12 months to children over the age of three and their parents (§ 361.5, subd. (a)(1)), the presumptive rule for children under the age of three on the date of initial removal is that "court-ordered services shall not exceed a period of six months from the date the child entered foster care." (§ 361.5, subd. (a)(2); see *In re Christina A.* (2001) 91 Cal.App.4th 1153, 1160–1161.) The " 'unique developmental needs of infants and toddlers' " [citation] justifies a greater emphasis on establishing permanency and stability

15

earlier in the dependency process " 'in cases with a poor prognosis for family reunification.' " [Citation.]' (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174–175.)"

" 'The status of every dependent child in foster care shall be reviewed periodically as determined by the court but no less frequently than once every six months.' (§ 366, subd. (a)(1).) 'The third paragraph of section 366.21, subdivision (e), requires a specialized inquiry at the six-month review for children like [this infant], who are "under the age of three years on the date of the initial removal" and are not being returned to the custody of their parents at that time. For such dependent children, if "the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to [s]ection 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (§ 366.21, subd. (e), italics added.)' (*M.V., supra,* 167 Cal.App.4th at p. 175 [italics omitted].)

" 'Thus, there are two distinct determinations to be made by trial courts applying the third paragraph of section 366.21, subdivision (e). First, the statute identifies specific factual findings—failure to participate regularly and make substantive progress in the court-ordered treatment plan—that, if found by clear and convincing evidence, would *justify* the court in scheduling a .26 hearing to terminate parental rights.' " (*Fabian L., supra,* 214 Cal.App. 4th at pp. 1026–1027.)

" 'The second determination called for by the third paragraph of section 366.21, subdivision (e), protects parents and guardians against premature .26 hearings. Notwithstanding any findings made pursuant to the first determination, the court shall not set a .26 hearing if it finds either[:] (1) "there is a substantial probability that the child ... may be returned to his or her parent . . . within six months . . ."; or (2) "reasonable services have not been provided . . ." to the parent. (§ 366.21, subd. (e).) In other words, the court must continue the case to the 12-month review if it makes either of these

16

findings. However, the court is not required to set a .26 hearing even if it finds against the parent on both of these findings. The parent is also entitled to continued reunification services (with any necessary modifications) if the court makes either of these findings in favor of the parent. [Citations.]' (*M.V., supra,* 167 Cal.App.4th at p. 176, fn. omitted.)" (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1028.)

" 'We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." [Citation.]' (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)" (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1028.)

## II. Analysis

### A. *No substantial probability that Mother may reunify with the child by the 12-month date*

Mother contends that the court erred in determining that there was no substantial probability the child would be returned to her within a period of extended services. She asserts that, with limited exceptions, she complied with the case plan and made significant progress in addressing the causes of the court's intervention. We disagree.

The court could well determine that Mother's enrollment in Humboldt Domestic Violence Services less than one week before the six-month review hearing, her attendance at one class, her enrollment in a clean and sober home a day later, and her declarations of her intent to stay away from the father, to quit smoking marijuana, to find a class to help her deal with her severe anxiety, and to take a parenting class were all "too little, too late." None of these belated actions or good intentions suffice to undermine the court's finding that her progress in the court-ordered treatment plan to date had been minimal. Nor do they undermine the court's refusal to find that there was "a substantial

17

probability that the child . . . may be returned to his or her parent . . . within six months . . . ." (§ 366.21, subd. (e).)

Mother avoided compliance with key components of her service plan until literally the last week of the reunification period. Despite the social worker's having taken her to enroll in the domestic violence program early in the dependency, Mother failed to stay in contact with the domestic violence advocate and failed to participate in available services. Although repeatedly encouraged by Maldonado to participate in Humboldt Domestic Violence Services, Mother failed to do so. She remained in her tumultuous relationship with the father through the bulk of the dependency despite repeated instances of domestic violence. As late as two weeks before the six month review hearing, when discussing the domestic violence in their relationship and what she needed to do to be safe, Mother seemed once again to hesitate, responding, "Well, I don't know. I don't know. I just kept thinking he was going to change."

Similarly, although Mother was transported to and completed a psychological assessment with Dr. Renouf and a mental health assessment at County Mental Health Services, she failed to follow through with the recommendations of either. At County Mental Health she was signed up for intervention services and referred to a Seeking Safety therapy group. Nevertheless, she declined medication support and failed to participate in any of the services offered. She failed to keep her appointment to establish a primary care physician at Open Door Eureka.

Throughout the dependency, Mother failed to establish safe and stable housing, apparently moving between her two sisters in Fortuna and Arcata, her parents, and motels, often staying with the father. She was vague with the social worker when asked where she was staying. She repeatedly refused to access the help that Humboldt Domestic Violence Services was ready to provide, despite at one point committing to do so. The social worker testified that housing was a service that Mother could have accessed through Humboldt Domestic Violence Services, as she finally did the week before the hearing.

18

Nor did Mother follow through with the recommendations of Dr. Renouf that she abstain from her use of medicinal marijuana, despite his having explained to her the reasons for this recommendation. Even her testimony at the six-month review that she had quit days before, gave the court ample reason to conclude that her commitment was, at best, shaky and at worst, nonexistent. She testified variously that she had probably stopped smoking when she entered the clean and sober house, had stopped three days before that date, and that she was "going to quit" and was instead intending to participate in anxiety groups. Further, her testimony that she had not smoked marijuana in the bathroom during a visit early in the dependency provided further reason to question her credibility specifically on this issue and more generally as well.

Although her visits were consistent and regular, Mother needed repeated redirection and assistance in her interactions with the baby. The father usually accompanied her to her visits, despite the department's having arranged separate visitation because of the domestic violence issues in their relationship. Visitation could not be deemed successful as Mother seemed unable to incorporate and use the parenting education and advice given by the staff during visits. As the court found, she did not make significant progress in resolving the problems leading to the child's removal.

Substantial evidence supports the court's finding that Mother did not make significant progress with her case plan. Moreover, were we to conclude—which we do not—that Mother substantially complied with her case plan, we would still conclude that her progress toward reunification was minimal. "[A parent's] substantial compliance *with [her] case plan* must not be confused with the requirement a parent make substantial progress *towards reunification* with [the child] within the statutorily prescribed time period of six months. The one finding does not automatically compel the other." (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1029.) There is little evidence here that Mother made more than minimal progress with respect to alleviating or mitigating the problems that led to the child's detention, with either her issues of domestic violence or mental health. Mother's belated attempts to comply with her case plan were not enough to

justify making the child wait any longer for the mere possibility of reunification with Mother. (See *In re Brian R.* (1991) 2 Cal.App.4th 904, 918.)

**B. *Substantial evidence supports the court's finding that the department provided reasonable services***

Mother argues that "the department did not establish by clear and convincing evidence that it provided reasonable services." However, as we stated above, the substantial evidence standard guides our review of the court's findings. (*Fabian L.*, *supra*, 214 Cal.App.4th at p. 1028; *Kevin R. v. Superior Court, supra,* 191 Cal.App.4th 676, 688–689.) There is little doubt that in this case the department provided reasonable services designed to assist Mother in overcoming the issues that led to the dependency. These services are described in some detail above.

Mother's assertion that the department did not provide reasonable reunification services hinges in large part on her claim that Maldonado was mostly unavailable to her and, particularly after her incarceration, did not return her calls and did not respond to her requests for information as to how to access programs she needed. Maldonado disputed Mother's testimony, testifying that she and her intern had contact with Mother throughout the dependency, at least a couple of times a month. Maldonado had never said to Mother that there was no point working on her plan because she wasn't going to get her baby back. Nor had she ever said Mother should just give up. Indeed, it was Mother who made these comments to the social worker and in her meeting with the domestic violence advocate. Moreover, Maldonado continued to assist Mother in numerous instances after Mother's incarceration, including encouraging her to use the domestic violence resources to which Maldonado had introduced her and transported her.

Maldonado testified that Mother had called less than five times and probably only once or twice during the entire dependency. Most of the time the father would call for both of them. Mother rarely, if ever, left a phone message. Nor did Mother ever express to Maldonado that she was having difficulty working with the latter until about two weeks before the six month review when confronted with the department's termination of services recommendation.

20

"Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation . . .).' (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.)" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–973.) Furthermore, as recognized in *In re Misako R.* (1991) 2 Cal.App.4th 538, 547: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." We agree and conclude that in this case Mother "was provided with the assistance of numerous people and agencies and the services provided were reasonable under the circumstances." (*Ibid*.)

DISPOSITION

The court did not err in terminating reunification services and referring the case for a section 366.26 hearing. Consequently, the writ petition is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(3).)

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*


      * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.