Filed 9/17/15  C.M. v. Super. Ct. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| C.M.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>    Real Parties in Interest. | A145380<br><br>(Contra Costa County<br> Super. Ct. No. J1400737) |

C.M. (mother) petitions for extraordinary writ review of a juvenile court order terminating reunification services and setting a selection-and-implementation hearing under Welfare and Institutions Code section 366.26[1] regarding her daughter, A.C. Mother argues the juvenile court's order terminating reunification services is not supported by substantial evidence.  We disagree and deny the petition.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

1

In July 2014, respondent Contra Costa County Children and Family Services Bureau (the Bureau) filed a petition alleging that A.C., aged five months, was subject to the juvenile court's jurisdiction under section 300, subdivisions (b) (failure to protect) and (e) (severe physical abuse of a child under five years of age). The petition alleged that on or about July 4, 2014, while A.C. was in mother's care and custody, mother failed to supervise the child adequately and, as a result, the child sustained an unexplained, nonaccidental fracture to her upper left arm.

The detention/jurisdiction report filed by the Bureau stated that mother brought A.C. to Sutter Medical Center on July 5, where the child was found to have three breaks in her upper left arm. Father also sought treatment at Sutter that day for a hand injury. Mother gave conflicting accounts to the medical staff, first stating that she left A.C. with an older cousin and later stating that she was with the baby the whole time. A.C. was transferred from Sutter to Children's Hospital in Oakland. The social worker interviewed mother and father at Children's Hospital on July 7. Mother recounted that she hosted a picnic at her home on July 4th. During the picnic, A.C. was in her carrier, and her young cousins (aged two to five years old) were playing with her. Mother did not know how her baby daughter sustained a broken arm while strapped in a carrier, but suggested one of A.C.'s cousins might have done something. The baby slept through the night and started crying the next morning when mother touched her left hand. At that point, mother noticed A.C.'s left arm was swollen. Mother denied having any history of drug abuse or domestic violence with father. Mother reported that she lived with father for a couple of months during her pregnancy, but they no longer live together. Mother's affect was flat throughout the interview, and she showed no emotion when informed that the child would be detained.

Father told the social worker he received treatment at Sutter on July 5 after he injured his hand wrestling with his brother at his cousin's home in Antioch on July 4th. Mother got a ride to Sutter from A.C.'s maternal grandfather, and they picked up father

on their way with A.C. Father's hand was placed in a splint after an x-ray revealed his index finger was broken. Regarding A.C.'s injury, father stated that mother told him she noticed A.C.'s arm was swollen the morning after the picnic and became concerned. Father denied having any substance abuse problems. He stated that he recently completed a probationary sentence for gun possession. He opined that mother was good with the baby and stated that he did not believe the baby was unsafe with her.

The social worker also spoke with Rachel Gilgoff, M.D., a pediatrician at Children's Hospital. Dr. Gilgoff stated that a skeletal survey of A.C. showed a humerus fracture of the left arm but no other broken bones; the injury was relatively new with no signs of healing, and she believed it could have occurred anytime within the last five to seven days. She opined that a broken arm on a child as young as A.C. would result in extreme pain and cause the child to cry a lot. Dr. Gilgoff could not rule out the possibility that an "extremely strong" five-year-old child might have pulled A.C.'s arm hard enough to break it. She could not conclusively determine whether A.C.'s injury resulted from an act of child abuse, but she was concerned about the differing explanations mother provided for the injury. Based on the nature and severity of A.C.'s injury, as well as the lack of clarity on how and when it happened, the Bureau recommended A.C. be continued in out-of-home care. At the detention hearing on July 9, 2014, the court found that A.C. was a person described in section 300, ordered her detained, and referred mother for parenting and counseling services pending further proceedings.

On September 23, 2014, the Bureau filed an amended petition adding allegations against father under section 300, subdivision (j) (abuse of sibling). It alleged that A.C.'s paternal half-sibling was seriously injured while in father's physical custody, that father was unable to provide an explanation for the injuries, that father received reunification services in that case, and that those services were ultimately terminated. On September 26, 2014, the Bureau filed a request for judicial notice of the dependency file of the half-sibling and attached to its request certain documents from that file. The documents revealed that the Bureau had alleged that the minor suffered serious physical harm

3

inflicted nonaccidentally while under the care of the father, including arm and rib fractures, and that court-ordered reunification services be provided to father, including his participation in an anger management class. The documents also showed that in October 2013, the court terminated reunification services for father and returned custody to mother. The court ordered that father "continue to be deprived of physical custody of the child," and he was not to live in the home of the half-sibling.

At the jurisdictional hearing on September 29, 2014, the court took judicial notice of the contents of the dependency file of the half-sibling. The court also struck language in the allegations against mother that A.C.'s fracture was "non-accidental," and sustained the allegations as amended after mother pleaded no contest on the understanding she would receive reunification services.

The Bureau's disposition report dated October 29, 2014, noted that A.C. was currently placed in a licensed foster home in Contra Costa County. The report stated that A.C. has three half-siblings, two male and one female, each of whom lives with his or her mother, and petitions were filed as to two of them (N.C. and D.C.) alleging that they suffered nonaccidental fractures while in father's care. Father has a history of arrests including battery, robbery, infliction of corporal injury on a spouse/cohabitant, drug offenses, and weapons charges. The social worker opined it would not be appropriate to place A.C. with father (the noncustodial parent) due to his prior child welfare history and the fact that he failed to reunify with two of his children, N.C. and D.C., who sustained similar injuries as A.C. The Bureau recommended no services be provided to father under section 361.5, subdivision (b)(10) (prior termination of services for failure to reunify).

The report also related that mother became involved in a relationship with father when she was 18 years old and became pregnant. Father moved in with her, and they lived together until she was in her sixth month of pregnancy. According to mother, she and father remained friends and decided to co-parent but were not together as a couple. Mother denied father was present when A.C. was injured. Mother maintains she put A.C. to sleep the night before taking her to the hospital, and at no time did A.C. scream in

4

pain. She only noticed A.C.'s swollen arm the next morning when she got up to change A.C.'s clothes. Mother denied any alcohol or drug use and denied any domestic violence or problems controlling her anger. She had completed an eight-week parenting class. She enrolled in individual therapy and attended one session and cancelled one session on very short notice, claiming a family emergency.

As to visitation, the report stated that since July mother had been seeing A.C. once per week for one hour under the Bureau's supervision. The visitation monitor noted mother was attentive and comforting to A.C. during visits. Mother was allowed to call A.C. in placement on Wednesday, Thursday, and Friday; the foster parent reported mother usually called only on Wednesday and Friday and was not always timely on her phone calls. The social worker stated that she was troubled by the parents' inconsistent statements regarding the last time father saw A.C. before the July 4th picnic. In this regard, on September 17, 2014, mother told a social worker father stopped by her home a week or two before July 4th and spent about an hour with A.C. Father's timeline was different—on October 27, 2014, he told the social worker he stopped by mother's house on July 3, 2014, and he and mother took A.C. to the park together and A.C. played on a blanket. Regarding mother's account of events at the July 4th picnic at her house, the social worker was concerned "that the baby was left unprotected in a carrier on the ground for so long under such circumstances and [found] it unusual that with so many witnesses, no one knows what happened to [A.C.]. It is also concerning that if this break was sustained during the party as [mother] presents, that there was no screaming as medical personnel reported there would have been with a break of this severity. There are troubling circumstances for which no one has presented a satisfactory explanation."

Following a disposition hearing held on November 20, 2014, the court found that A.C. was a person described in section 300, subdivisions (b), (e), and (j) and that there was substantial risk to A.C.'s physical health if she were returned to her parents' custody. It ordered A.C. to be removed from the parents' custody under section 361, subdivision (c)(1). It also ordered the Bureau to provide family reunification services to mother; allowed mother to have visitation with A.C. once a week for one hour, at a

5

minimum; and enabled the Bureau to authorize consecutive overnight visits for a maximum of two days. The court ordered that father receive no reunification services.[2]

Subsequently, the Bureau prepared a status review report dated April 23, 2015. Commenting on current family circumstances, the report stated that in December 2014 both mother and father were named as responsible parties in allegations made to the Antioch Police Department about human trafficking activity between June and November 2014. The victim claimed she was living with mother and father, who forced her to prostitute to earn them money. Parents allegedly created RedBook and craigslist.com advertisements for the victim and installed her at the Executive Inn (room 211) in Antioch. The victim alleged that she broke free on November 23, 2014, but father assaulted her as she escaped, and she sustained two black eyes and a bloody nose. Meanwhile, father was arrested for attempted murder and firearm offenses by Antioch police in February 2015, after allegedly shooting a male victim in the calf. At that time, father was incarcerated at Martinez Detention Facility.

The report indicated that mother was presently pregnant, but she denied any ongoing relationship with father. The Bureau checked with the Martinez jail, and it discovered that mother was the only visitor on father's visitor list and that she had visited him ten times as of April 1. Mother told the social worker she had not seen father for about two months when in fact she had seen him two days before at the jail. Also, mother was using father's cell phone during his incarceration, despite leading the social worker to believe she had no cell phone and could be reached only by message phone. The social worker discovered the deception when she was with mother, dialed father's number, heard the phone ringing, and directed mother to answer it. Mother obtained employment at P-Za Pie in Concord and was currently attempting to re-enter a program that might assist her in finding accommodation.

---

[2] Father filed a timely notice of appeal on December 1, 2014. On April 24, 2015, we dismissed the appeal, *D.C. v. Contra Costa Children and Family Services Bureau* (A143717), after father's attorney filed a declaration stating he believed there were no arguable issues for review on appeal.

Mother's case plan called for her to participate in individual counseling, and she was in therapy twice a month. The Bureau received a progress report from the therapist on March 12, 2015, stating mother had participated in 13 sessions and recommending mother continue with the psychotherapy sessions as currently scheduled. Mother received a certificate of participation for attending a parenting education class that ended on April 20, 2015; however, of the 11 topics, mother had three left to complete, and the instructor wanted her to make up the topics missed, namely, nurturing skills, anger management, and parent-child relationship. The instructor thought it important that mother complete these topics because she was "high risk in many areas" and thought "of her own needs first."

The report also indicated that mother was visiting with A.C. three times a week. On Monday mornings, mother participated in a one-hour sensory art class at Contra Costa Children and Families Commission's First 5 program with A.C., and on Thursday mornings she participated with A.C. in the one-hour Storytime with Ernie at First 5. Mother had supervised visits with A.C. on Friday mornings. Reports from the supervision monitor of these visits were troubling and raised concerns about mother's interactions with A.C. For example, while holding A.C. in the park one day, mother engaged another woman in aggressive, angry tones; also, mother continued to call A.C. "fatty" even after the monitor censured her about it. The monitor reported she was concerned about mother's "lack of gentleness" with A.C. and commented that mother "wants to be in control of what [A.C.] is doing" and "gets angry at [A.C.] for playing with the blinds in the office instead of redirecting her." Another incident of concern reported by the visitation monitor was when A.C. reached for crayons with her left hand, and mother said, "You're going to be left handed, why? That's so ugly." Mother's parenting approach and interaction with A.C. improved on more recent visits after the supervision monitor discussed her concerns with mother, and they began debriefing sessions after each visit.

The status report stated that A.C. was now 15 months old. At an orthopedic appointment at Children's Hospital on February 6, 2015, the fracture was determined to

7

be healing properly, and a follow-up examination was recommended in one year. A.C.'s arm appeared to be slightly bowed due to new bone growth, but the doctor opined it would straighten as she grew older.

The Bureau opined that if mother were able to demonstrate consistent progress with her parenting skills and sustain stability in her living condition over a period of time, there would be a substantial probability of A.C. returning home by September 5, 2015. The Bureau recommended family reunification services be continued for mother and a review hearing be set.

The parties appeared on April 23, 2015, and the matter was set for a contested status review hearing on May 14, 2015. The status review hearing was continued from May 14 to June 1, 2015. Mother testified at the hearing about the benefits she thought she had derived from her counseling sessions and how she implemented what she learned in parenting class in her interactions with A.C. She testified she had not been in a relationship with father since A.C. was born. Mother knew the court "didn't want [A.C.] to have contact with [father], but I didn't know it was best for me to stay away from him as well," so she thought it was all right to visit him in jail. Regarding the human trafficking allegations in the Bureau's April 2015 status report, mother stated that she had not been questioned by police on the matter, and there were no charges pending. Mother had been living with an aunt in Pittsburg since April 2015, and A.C. could live there if she were returned to mother.

On cross-examination, mother stated that therapy had "really been about bettering me and helping myself get back on track," rather than helping her understand the reasons A.C. was removed from her care. Mother had no problem with contact between father and A.C. but "would stick with it" if the Bureau wanted her to ensure father had no contact with A.C.

The Bureau social worker, Judy Flores, testified she had concerns about the allegations of human trafficking against mother and father. Flores stated that "a report [was] filed with the sheriff's office as well. There wasn't any new information but it was more like they couldn't contact [parents] because of them being transient. They couldn't

8

make contact, so it was kind of dropped." Based on her conversations with mother's therapist, Flores believed that mother was not being honest with her therapist about her contact with father. Flores opined that mother had made progress recently in her visitations with A.C. and was learning to relate better to her daughter. Flores testified that mother's continuing contact with father "does trouble me" and opined that mother did not appreciate "the dangers of continuing a relationship" with him. Mother told Flores she believed all the pending charges against father were false.

After testimony concluded and the court heard oral argument, the court remarked that the Bureau's recommendation for further reunification services for mother was not "supported at all by the evidence or the facts in this case." In the court's view, mother's testimony demonstrated "a complete lack of insight." The court noted that mother had the opportunity "to express all that she has learned through her participation in services; the insight, if any, she has gained through this process." But her testimony showed that mother "has gained really very little if any insight whatsoever into what led to this dependency and what the issues are for her as the mother and for [A.C.] as really the helpless infant in this case." The court found that mother failed to make substantive progress in her case plan, and there was no substantial probability that A.C. would be returned to mother. (See fn. 3, *post.*) The court stated that it was "very troubled, not only by the allegations of sex trafficking, but beyond that, that victim reported that she was forced to live with mom and [father], which shows an ongoing relationship, even if you discount the trafficking issue." The court was also concerned mother lied to the social worker about her ongoing relationship with father and continued to deny any sort of connection or relationship with him when in fact she was using his cell phone and visiting him regularly in jail. The court also found that mother continued to parent A.C. poorly even though she had been given extensive services, as reflected by the visitation monitor's reports that mother showed a lack of gentleness with the minor and was quick to become angry with "a child who presented with a very significant injury indicative of very serious child abuse." For those reasons, the court ordered "termination of services to mother and the setting of a permanency hearing."

9

*A.      Applicable Legal Standards*

" 'Family reunification services play a "crucial role" in dependency proceedings.' [Citation.]" (*In re J.P.* (2014) 229 Cal.App.4th 108, 120.)  But these services, "when provided, are subject to time limitations. . . .  For a child who was under three years of age on the date of the initial removal from the parent's custody, . . . court-ordered services shall be provided for a period of six months from the dispositional hearing but no longer than 12 months from the date the child entered foster care, unless the child is returned home.[3]  [Citation.]" (*Id.* at p. 121.)  The "presumptive rule" that court-ordered services for children under the age of three on the date of initial removal shall not exceed a period of six months from the date the child entered foster care was warranted by the unique developmental needs of infants and toddlers, which " ' "justifies a greater emphasis on establishing permanency and stability earlier in the dependency process in cases with a poor prognosis for family reunification." ' [Citation.] [Citation.]" (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1027.)

Accordingly, section 366.21, subdivision (e) requires a "specialized inquiry" at the six-month review for children, like A.C., who are " ' "under the age of three years on the date of the initial removal" and are not being returned to the custody of their parents at that time. For such dependent children, if "the court finds by clear and convincing

---

[3]  A child is deemed to have entered foster care on the earlier of (1) the date of the jurisdictional hearing or (2) 60 days after the child was removed from physical custody of the parent.  (See § 361.49)  A.C. was removed from mother's custody on July 5, 2014, so was deemed to have entered foster care on September 5, 2014, as the contested jurisdictional hearing was held on the later date of September 29, 1014.  Thus, the 12-month permanency review was due no later than September 5, 2015.  (§ 366.21, subd. (f) [permanency hearing must be held no later than 12 months after child entered foster care].)  As acknowledged by the parties, the juvenile court, in determining likelihood of reunification, was required to consider only the time remaining from June 1, 2015, until the last date for the permanency hearing on September 5, 2015.  (See *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846 [in determining likelihood of reunification, juvenile court was required to consider only time remaining until potential 12-month review, even if less than six months].)

evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to [s]ection 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." [Citation.]' [ Citation.]" (*Fabian L., supra,* 214 Cal.App.4th at p. 1027, italics omitted.)

Thus, section 366.21, subdivision (e) requires the juvenile court make two distinct determinations. The first determination involves " 'specific factual findings' " based on clear and convincing evidence regarding whether a parent failed to participate regularly and made substantive progress in the court-ordered treatment plan; such findings justify the court in setting a section 366.26 but do not mandate that the court do so. (*Fabian L., supra,* 214 Cal.App.4th at pp. 1027-1028.) Under the second determination, which " 'protects parents . . . against premature .26 hearings,' " the court *shall not* set a section 366.26 hearing and *must* continue the case to the 12-month review if it finds either (1) there is a substantial probability that the child may be returned to his or her parent by the 12-month permanency hearing date; or (2) reasonable services have not been provided to the parent.[4] (See § 366.21, subds. (e) & (f); *Fabian L.,* at p. 1028.)

" 'We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." [Citation.]' [Citation.]" (*Fabian L., supra,* 214 Cal.App.4th at p. 1028.)

---

[4] Mother does not contend the services provided to her were unreasonable.

11

*B.     Analysis*

In her petition for extraordinary writ, mother contends substantial evidence does not support the trial court's determination under section 366.21, subdivision (e) that she failed to participate regularly and make substantial progress in the court-ordered treatment plan.  We are not persuaded.

We acknowledge that the record reflects mother's active participation in her treatment plan—she completed a parenting class, was engaged in individual counseling sessions twice a month, and maintained her weekly visitation schedule with A.C. Nevertheless, despite mother's participation in her case plan, substantial evidence supports the juvenile court's ultimate determination that she failed to make substantive progress.  Specifically, by the time of the six-month review, which was held 11 months after A.C. was removed from mother's custody, mother had not yet transitioned to unsupervised visitation outside of a class or supervised setting.  Also, mother showed signs of stress and anger even under the structured and controlled visitation she had with A.C.  For example, it was observed that while holding A.C. in the park one day, mother engaged another woman in aggressive, angry tones, and that in general mother showed a "lack of gentleness" with A.C.  Mother wanted to control what A.C. was doing, and when A.C. did not pay attention to her, mother became angry instead of trying to redirect the minor.[5]

Furthermore, whereas mother participated in a parenting class as required under the case plan, she still had three of the 11 topics left to complete, namely, nurturing skills, anger management, and parent-child relationship, and the instructor believed it was important that she do so because mother was "high risk in many areas" and thought "of her own needs first."  Mother's testimony at the review hearing also demonstrated that her participation in counseling had not resulted in substantive progress in her case plan.

---

[5]  Although the record indicates mother's parenting approach and interaction with A.C. improved somewhat after the supervision monitor initiated debriefing sessions, these observations cannot be ignored when the at-risk minor was detained because she suffered an unexplained, multiple fracture to her arm.

Specifically, she acknowledged that the therapy had "really been about bettering me and helping myself get back on track," rather than helping her understand the reasons A.C. was removed from her care.

Mother's lack of substantive progress was also demonstrated by her attitude toward, and relationship with, father, who mother knew had been denied reunification services by the court in this matter because in a prior dependency matter it was found that two of his older children suffered unexplained, serious injuries while under his care and supervision. In April 2015, mother was almost three months pregnant but denied that the father of her unborn child was A.C.'s father. Indeed, mother denied any relationship with father but visited him regularly in jail and was discovered to be using his cell phone. Mother testified she had no problem with contact between father and A.C., but "would stick with it" if the Bureau wanted her to ensure father had no contact with A.C. The social worker testified that she believed mother was not being open and honest with her therapist about her contact with father and opined mother did not appreciate the dangers of her continuing relationship with him.

This evidence constitutes substantial evidence to support the trial court's finding that mother failed to make substantive progress in a case plan designed to resolve the problems that led to A.C.'s removal. But in addition to this evidence, there are also the human-trafficking allegations against mother. In her petition, mother challenges the court's reliance on an "unsubstantiated" report of human trafficking.[6] But at the hearing, the social worker testified without objection that the human-trafficking allegations against mother and father were contained in two police reports, in which father and mother were "specifically name[d] . . . as having forced . . . the victim to prostitute to earn them money." Furthermore, the social worker testified that according to the report, the trafficking started in June 2014, prior to A.C.'s removal in July 2015, and ended when the victim escaped in November 2014, during which time mother was in therapy as

---

[6]   Indeed, mother contends the juvenile court "improperly based its decision" on the report. Whereas the juvenile court relied *in part* on the report, we have already concluded that substantial evidence supports its decision absent the report.

13

a consequence of A.C.'s removal. Accordingly, the juvenile court was entitled to consider this information, which supports the court's finding that mother had not shown substantive progress in her case plan.

Finally, the evidence adduced above also justifies the trial court's finding that there was not a substantial likelihood of A.C. being returned to mother's care by September 5, 2015, only three months after the six-month review hearing held on June 1, 2015. In this regard, mother's lack of substantive progress in her case plan, together with her deception and lack of honesty concerning her relationship with father, demonstrated she lacked the "capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, [and ] physical and emotional health" within such a short period of time. (Cal. Rules of Court, rule 5.710(c)(1)(D)(i)(c.).)

DISPOSITION

Mother's petition for an extraordinary writ is denied on the merits. The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) Mother's request for a stay of the section 366.26 hearing, currently scheduled for September 24, 2015, is denied as moot.

 

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.


*C.M. v. Superior Court* (A145380)

15