Filed 9/15/16  C.Z. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.Z.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>　　　　Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>　　　　Real Party in Interest. | A148651<br><br>(Contra Costa County<br>Super. Ct. Nos. J15-00788,<br>J15-00789) |

Petitioner C.Z., the mother of three-year-old K.D. I and 14-month-old K.D. II,[1] challenges the Contra Costa County juvenile court's June 15, 2016 order terminating family reunification services and setting a hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  For the reasons stated below, we deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 2015, the Contra Costa County Children and Family Services Bureau (bureau) filed petitions for each child alleging that C.Z. (Mother) has a substance abuse

---

[1]　　The two minors have the same initials.

[2]　　Unless otherwise noted all statutory references are to the Welfare and Institutions Code.

1

problem that impairs her ability to care for that child.[3] According to the July 16, 2015 detention/jurisdiction report filed by the bureau, Mother arrived at Alta Bates Hospital by ambulance, under the influence of alcohol, and delivered K.D. II in the hospital lobby. On a scale of 1 to 10, Mother's alcohol level was 9.3; K.D. II was born intoxicated. The newborn was admitted to the neonatal intensive care unit for respiratory distress. Mother later reported that she had a toothache the day she gave birth and consumed vodka, rather than pain medication, due to her concern that she not take such medication when she was two days overdue. She also stated that due to her high tolerance for alcohol, she did not feel drunk.

After the delivery, the bureau received a referral alleging general neglect by Mother. Mother agreed to attend counseling and support groups and to submit to random drug and alcohol testing. She was already attending counseling and drug testing under the terms of probation imposed in criminal proceedings. Her probation officer reported that she had been convicted for physical abuse (described below) and then violated her probation when she assaulted her oldest child in September 2015. Nonetheless, the probation officer described Mother as a "model probationer," keeping all her appointments, completing parenting and life skill classes, and submitting to random drug testing. The probation officer opined, however, that the testing did not include testing for alcohol consumption. Because of the parents' willingness to engage in services, the willingness of the children's paternal grandfather to allow the children to reside with him if Mother experienced a relapse, and the father's agreement to protect the children if Mother relapsed, the children were returned to Mother's care. Pursuant to a voluntary

---

[3] The petition regarding K.D. I also alleges that Mother has a history of engaging in domestic violence with the father, which places the child at substantial risk of emotional harm and physical injury. That allegation was ultimately dismissed, with Mother promising to engage in domestic violence classes. The analogous allegation in the petition regarding K.D. II is crossed out.

The petitions also make allegations regarding the father. The current writ petition, however, is only from Mother. Consequently, we focus on the facts relevant to her.

2

family maintenance plan, Mother enrolled in outpatient treatment at the Ujima West Recovery Center and agreed to comply with her probation requirements.

However, after Mother began treatment at Ujima, the bureau learned that she arrived at her program drunk three times within a seven-day period. Once she drove with her children while intoxicated. Based on these developments, the bureau decided the children should be placed in protective custody. The paternal grandfather indicated that he was unable to care for them; no other family member could be approved for immediate placement. Therefore, the children were placed in protective custody on an emergency basis and petitions were filed on their behalf. K.D. I and K.D. II were formally detained on July 16, 2015. On October 20, 2015, Mother pled no contest to the allegation that her substance abuse problem impairs her ability to care for the children.

The bureau's October 20, 2015 dispositional report recommended that family reunification services be provided to Mother. The report reviewed the mother's child welfare history in two counties, which showed that there had been five previous allegations of abuse/neglect between 2007 and 2014 concerning K.D.I and two older children who are not the subjects of this petition. It also showed that Mother had a March 2010 misdemeanor conviction for corporal injury on a spouse or cohabitant and a February 2013 felony conviction for inflicting injury on a child. The report also noted that Mother has a total of four children—none of whom were in her care. Her oldest child was conceived when Mother was raped. During a court-ordered visit, Mother physically assaulted the child, resulting in her conviction for corporal injury upon the child. The court issued a restraining order, prohibiting Mother from having contact with the two older children. The paternal grandmother is the legal guardian of Mother's second child. The eldest child, who suffers from "ongoing behavioral and mental health problems," was placed in foster care.

When she was very young, Mother was exposed to extreme domestic violence. Her father shot himself while attempting to murder her mother. Mother's father was a heavy drinker and very abusive towards Mother's mother. As a child, Mother and her siblings were the subjects of multiple child welfare referrals.

Mother began drinking alcohol when she was approximately 13 years old.  She recounts that her consumption was relatively sporadic until guardianships were established for her older two children.  She denies any other substance abuse and claims that she did not drink when she was pregnant with K.D. II.  She insists that she did not have a consistent pattern of alcohol abuse before the bureau intervened with her family.

Mother also concedes that she has trouble managing anger, which has affected her relationships with her eldest daughter and her romantic partners.  There were incidents of choking and hitting with her prior partner, especially when they were both drinking.  She denies any significant violence in her current romantic relationship, but admits that when she is angry at her current partner, she has occasional affairs with her former partner.  She admits that this behavior is immature and is working to find other means of dealing with her anger.

When Mother was released from custody, she entered an inpatient substance abuse program at The Rectory Women's Recovery Center in San Pablo, where she was described as an actively engaged "model resident," who sets a positive example for other residents.

The report also stated that Mother had weekly visits with her children since she had been released from custody, which went "exceptionally well."  The bureau authorized overnight visits with Mother at her program, one of which had already taken place.  Again, it was assessed as having gone "exceptionally well." The bureau anticipated extending the visits and Mother continued to demonstrate her ability to keep the children safe while addressing her substance abuse and anger management issues.

The bureau's assessment of Mother acknowledged that she did "exceptionally well in treatment" and was expected to graduate her current residential treatment in late October 2015.  She was to be honored as the "mistress of ceremonies" at the Ujima Recovery Award Ceremony and her primary counselor described her participation in the program as "exemplary."  She had already contacted an outpatient treatment center and anticipated promptly entering the program when she graduated from The Rectory.  Mother's probation officer "copiously laud[ed] her for her continued adherence to her

case plan and compliance with meetings, drug testing and all other components of her probation case." The bureau, nonetheless, was concerned about "her ability to maintain her sobriety outside of a structured, program especially given her history of continued alcohol abuse while still in outpatient treatment." It noted that notwithstanding her history of exemplary participation in programs, she continued to place the children at risk. It specifically noted the July 7, 2015 incident, when she drove with the children when she was drunk. The bureau was especially concerned that this had happened while she was in treatment. Similarly, it expressed concern that her anger and emotional problems presented an "exceptionally high" risk of relapse, given her relatively short treatment, when seen in the context of her past trauma. In summary, the bureau wrote, "While her compliance is admirable, she has not yet demonstrated her ability to internalize lessons learned and use them to cope with stress and anger without resorting to anger and substance abuse. . . . Thus far . . . she has not sufficiently demonstrated her capacity to effectively resolve problems without destructive behaviors, and the bureau contends that additional time is needed for her to demonstrate that she can make the positive changes needed to keep her children safe from harm."

The court adopted the bureau's findings and recommendations contained in the October 20 report. Mother was required to participate in mental health counseling designed to address her past trauma and assist her in developing coping strategies to deal with her anger and stress, to complete a mental health evaluation by a licensed therapist, to participate in a domestic violence program aimed at developing positive communication techniques to resolve conflict, to engage in parenting education to learn appropriate ways to handle her children and, after successfully completing and graduating from her residential treatment program, she was required to complete a substance abuse outpatient program. The court set the six-month review hearing for April 12, 2016.

In its six-month report, the bureau reported that the children were stable in their placement. K.D. II was growing and thriving; K.D. I was active, talkative, and nearly potty-trained. Mother had started her outpatient treatment and all went well for the first 30 days. However, on December 5, 2015, when the foster mother picked up the children

5

after their visit with Mother, Mother appeared to be intoxicated. The social worker attempted to contact Mother but Mother did not contact the social worker for eight days. When she did she explained that she had been sick, so she had taken NyQuil cold medication—which she had just learned, made her "look high." By the end of December 2015, Mother was experiencing "a full-blown relapse"—arriving at group sessions drunk and also testing positive for alcohol. On January 19, 2016, Mother was placed on a "disciplinary contract," which she signed in the presence of her drug counselor and probation officer. Despite this effort, she was discharged from the Ujima West outpatient program on February 1, 2016, because she abruptly left in the middle of a group session without notifying staff. She had also violated her disciplinary contract and had not consistently submitted to random drug testing. Mother had no further contact with the bureau until February 24, when she called to say that she had been admitted to The Rectory, an inpatient program. The bureau then arranged a multidisciplinary case conference, held on March 10, 2016. At this meeting, Mother presented well; she seemed well-organized and clean; she participated in the meeting freely.

At the beginning of this reporting period, the children were having unsupervised visits with the parents on weekends. When Mother relapsed, the unsupervised visits were discontinued. When she entered The Rectory, Mother began to have weekly two-hour visits with her children. The report noted that the bureau could not determine whether Mother had developed a domestic violence relapse prevention plan; the report noted that she had not been able to control her negative behavior while intoxicated.

With respect to Mother, the bureau was concerned about her "ongoing substance abuse issues" coupled with her "propensity to manifest exemplary conduct" in a "program environment." The report noted her simultaneously drinking alcohol, while attempting to function normally, as if the professional staff were unaware of what she was doing. Because the bureau believed that the children could not be safely returned to either parent, it recommended that the court terminate reunification services.

The court held a contested hearing on June 15, 2016. There were multiple factors that contributed to the bureau's recommendation that services be terminated. The

testifying social worker agreed that one of the reasons was that Mother was "almost out of time." Her children were under the age of three and the bureau had to consider her behavior over the entire six months of the reporting period. She had had two relapses. Furthermore, Mother had two older children who were either placed with the bureau or with their paternal grandparent.

Mother testified that her current treatment program, unlike earlier programs, would prevent her from relapsing. She now had a sponsor. She was addressing issues with her therapist that had previously been unaddressed. She intended to go to 90 meetings in 90 days and, unlike previously, to work the steps.

For the six months prior to her hearing, Mother had consistently visited with the children once per week. She did not have any overnight visits with the children. Finally, Mother expressed the hope that she and the children's father would get back together.

The juvenile court terminated reunification services and set a section 366.26 hearing for October 5, 2016. In doing so, the court acknowledged that Mother loves her children, but recognized the tragic effects of alcoholism. It recognized Mother's efforts and her relapses. Given the long-standing problem Mother faces, the juvenile court opined it would "take a long time to cure" and, therefore, did not believe that the issue would be resolved in the limited time remaining.

Mother timely filed a notice of intent to file a writ petition and filed the petition on July 22, 2016. This court issued an order to show cause, the bureau filed its opposition, both parties waived oral argument.

## DISCUSSION

We review an order denying reunification services for substantial evidence. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839.) If the evidence relied on by the juvenile court is "reasonable, credible, and of solid value, such that a reasonable trier of fact could find the court's order was proper based on clear and convincing evidence" the juvenile court's order is to be affirmed. (*Id.* at pp. 839-840.)

For children who are younger than three years old when first removed from their parents' physical custody, court-ordered services are to be provided for six months from

7

the dispositional hearing, but no longer than 12 months from when the child entered foster care (unless the child is returned to the parents' home).  (§ 361.5, subd. (a)(1)(B).)  The juvenile court must order the physical return of the child to the parent unless it finds by a preponderance of the evidence that the return would create "a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.21, subd. (e)(1).)  If the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in the parent's treatment plan, the court may schedule a 366.26 hearing within 120 days.  (§ 366.21, subd. (e)(3).)  However, if the juvenile court finds either that there is a substantial probability that the child can be returned to the parent within six months or that reasonable services were not provided, the court is to continue the case to the 12-month hearing.  (*Ibid.*; see also *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1027-1028.)

For children who are older than three years old when removed from their parents, the presumptive rule is that reunification services are to be provided for 12 months (§ 361.5, subd. (a)(1)(A)); however, due to the " ' "unique developmental needs of infants and toddlers," ' " the presumptive period for court-ordered services is only six months when there is a relatively low likelihood of successful reunification.  (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174-175, citing *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 611-612.)  Juvenile dependency cases require the court to balance the goal of successful reunification, which involves meeting parental needs for individualized support, versus the children's needs for stability and permanency.  By distinguishing between children who are younger and older than three years old, the Legislature has slightly tipped the balance in favor of meeting the young children's needs for stability and permanency as quickly as possible.  This does not eliminate the possibility of reunification  with infants, but it does establish a strict timetable that does not allow for second and third chances when a parent suffers a significant relapse.

In this case, Mother was seen by her parole officer as a model parolee even before court-ordered services were initiated.  When she was in an inpatient program at the

Rectory she was viewed as a "model resident." At the program she was judged to be doing "exceptionally well in treatment." Her counselor described her participation in the program as "exemplary." Her probation officer "copiously laud[ed] her." Yet despite her exceptional efforts, she has been plagued by two relapses while in treatment: one in July 2015, while in treatment at Ujima when she drove with the children while intoxicated, and from December 2015 to February 2016, when she was discharged from the Ujima West program. Due to Mother's relapse her visiting privileges with the children were curtailed—going from overnight to unsupervised to supervised visits. To her credit, weeks after she was terminated from the Ujima West program, Mother seemed to pull herself together again, attended a multidisciplinary case conference and re-enrolled in an inpatient program.

The continuation of Mother's pattern—excellent participation in organized programs, but repeated periods of uncontrolled drinking, coupled with the need for greater restrictions in her visiting privileges and her past inability to care for her older children, provides substantial evidence supporting the juvenile court's finding that returning the children to Mother would create a substantial risk to their safety and physical and emotional health. Moreover, these facts constitute clear and convincing evidence that Mother failed to make "substantive progress" in her treatment plan, justifying the setting of a section 366.26 hearing. Tragically, although Mother has made genuine efforts to end her dependence on alcohol, as the juvenile court suggested, the trauma she has endured apparently prevents her from demonstrating sufficient progress in the short time frame allowed for the court to make the necessary findings to extend the period for reunification services.

## DISPOSITION

The petition for an extraordinary writ is denied. Our decision is immediately final as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

9

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.


A148651