Filed 11/8/24 In re J.P. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | B334183 (Los Angeles County Super. Ct. No. 22CCJP02453A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Cathy Ostiller, Judge. Affirmed.

Jane B. Winer, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Presumed father Jose P. (Father) appeals a juvenile court order terminating his reunification services at the 18-month permanency review hearing. (Welf. & Inst. Code, § 366.22.)[1] He contends that the court abused its discretion by (1) denying him further services, and (2) finding no reason to believe that the Indian Child Welfare Act (ICWA) applies to the child.

The record shows no abuse of discretion. Father refused to participate in services. No further services had to be provided because he made no progress. The ICWA issue is moot because a full ICWA inquiry was already ordered. We affirm.

## FACTS AND PROCEDURAL HISTORY

### Case History Described in Father's First Appeal

The facts in this first section are taken from our opinion in *In re J.P.* (Apr. 8, 2024, B329638 [nonpub. opn.]):

J.P. was born in 2018 to Father and A.V. (Mother). He was taken into protective custody by Los Angeles County Department of Children and Family Services (DCFS) in June 2022, when Mother was arrested while driving a stolen vehicle with J.P. riding unsecured inside of it. Father was incarcerated and could not take custody of J.P. Mother and Father have extensive arrest histories, starting at age 15.

_____

[1] Undesignated statutory references in this opinion are to the Welfare and Institutions Code.

2

J.P. was placed with his paternal grandmother (PGM), who denied Indian ancestry when questioned in court. Mother and Father also denied Indian heritage.

In September 2022, the court sustained one count against Mother for endangering J.P. Father submitted to dependency jurisdiction. J.P. was removed from parental custody. The court ordered reunification services and monitored visits. Because Father was incarcerated for much of J.P.'s life, the court ordered him to participate in individual counseling to address the impact of incarceration on J.P., as well as substance abuse issues.

Father was released from custody in October 2022. He met with the social worker (CSW) to discuss resources and the case plan. She advised him to sign up for medical benefits to receive therapy, offered transportation assistance, and showed him how to access links to service agencies. He was homeless but called and saw J.P. CSW was unable to obtain Father's phone number from Mother or PGM, though Mother said that he needed to "sober up." Father texted CSW in February 2023, but did not reply when she asked him for an update on his counseling.

The court ordered Father to meet with CSW and submit to a drug test. Father told CSW he felt no responsibility for the dependency proceeding; he had no insight into the impact of his recidivism on J.P.'s well-being. Father agreed to participate in a parenting program and monitored visits until he made progress on understanding case issues. He then failed to show up for a scheduled intake appointment with a service provider.

At the six-month review hearing in March 2023, Father blamed DCFS for failing to get him into a counseling program. The court ruled that he must participate in services before moving in with PGM and J.P. The court continued reunification

services and found that DCFS made reasonable efforts to return J.P. to a safe home.

Father appealed the ruling. We concluded that he received reasonable services and was responsible for his failure to participate. The court's refusal to allow Father to live with PGM was proper because it would pose a detriment to J.P. We wrote that ICWA imposes a continuing duty to ask extended family if the child is, or may be, Indian. At the six-month stage of the proceeding, there was still time to identify relatives having information relevant to the ICWA inquiry.

**The 12-Month Hearing**

In August 2023, DCFS reported that Mother was arrested in a hotel room with a stolen motorcycle, firearms, ammunition, and drug paraphernalia. At the request of DCFS, the court ended Mother's unsupervised visits with J.P. and required that her visits be monitored.

In September 2023, DCFS reported that Mother's therapist ended treatment after she stopped attending sessions in March. Mother planned to enroll in a substance abuse program and hoped to be released from prison by the end of 2023. Four-year-old J.P. continued to live with PGM; he speaks English and Spanish. He had tantrums and aggression from post-traumatic stress disorder (PTSD). PGM said that her authority was undermined by Mother, who contradicted PGM's disciplinary measures, lied to PGM, and falsely told J.P. that PGM wanted to take him away from Mother.

Father did not comply with court orders or answer calls from CSW or letters mailed to him. PGM said she was unable to motivate Father to make progress toward reunification. CSW submitted several referrals for him for parenting classes. In July

4

2023, he walked into a clinic and enrolled in counseling. DCFS sought to pay for the services, but Father failed to show up for sessions or respond to messages. "DCFS continue[d] to have great concerns as to father's ability to maintain a safe and stable environment for the child."

PGM monitored visits for Father, when he communicated with her, and said his visits are good. She hoped he could move in with her and J.P. DCFS did not liberalize visits because Father made no progress in his case plan and showed no interest in mitigating case issues to ensure J.P.'s safety and regain custody.

A hearing was held in September 2023, but because Mother and Father were incarcerated, the court continued the hearing to secure their attendance.

In last-minute reports, DCFS wrote that Mother was released from prison in October 2023. She admitted to a relapse and to using methamphetamine, but said she was no longer using drugs. PGM facilitated monitored visits between Mother and J.P. Father showed up unexpectedly at one visit, after PGM had not seen or spoken to him "in a while." J.P. attended counseling for PTSD and PGM was learning how to respond to his behavior. Mother restarted therapy sessions. DCFS asked the court to terminate reunification services.

After several continuances, the court held the 12-month hearing on November 27, 2023. Father was not present. The court observed, "Father really does not seem to be taking much of an interest in this case." Mother argued that her recent incarceration prevented her from securing services, as did an injury sustained in a car accident and financial constraints. She had resumed counseling. Father asked the court to find that he

did not receive reasonable services. He blamed his inability to comply with the case plan on his lack of housing.

The court found that continued jurisdiction was necessary because the conditions that justified dependency still exist and returning J.P. to parental custody would create a substantial risk of detriment. The court found that Mother made partial progress in completing the case plan; Father's progress was unsubstantial. DCFS made reasonable efforts to return J.P. to a safe home and complete steps needed to finalize his permanent placement. The court continued reunification services and ordered DCFS to provide Father with housing assistance. Parental visits had to be monitored.

### The 18-Month Hearing

In December 2023, DCFS reported that PGM did not want to be J.P.'s legal guardian, to avoid conflict with Mother. PGM declined further mental health therapy for J.P.; his current therapist was leaving and PGM's choices were limited because she requires a Spanish-speaking therapist. J.P. continued to act out, and kicked PGM. PGM had not enrolled J.P. in school.

Mother was in therapy, hoping to overcome criminal thinking, break old patterns, and create new opportunities by getting a job and going to school. She had housing through her probation, which was scheduled to end in October 2024. She visited J.P. three times a week and arrived with food for him.

In November 2023, while CSW was meeting PGM and J.P., Father stopped by to see J.P. CSW gave Father her business card and asked for his phone number. He replied that he does not have a phone or an address. CSW reminded him that the court ordered him to participate in counseling, and DCFS would help him with housing.

6

CSW wrote that during her meeting with Father, "he appeared jittery, [and was] unable to remain [ ] standing; he exhibited rapid speech, and appeared to be under the influence." PGM said it would be unsafe for Father to have unmonitored visits " 'because he is using drugs.' "

Father came to the DCFS office. He and CSW reviewed the most recent court order and case plan. Father said he previously enrolled in therapy but was unable to pay for it. He asked about housing and paying for classes. CSW gave Father a resource package for housing and services. They discussed enrolling in therapy with financial support from DCFS, and drug testing. He was given contact information for his attorney and agreed to meet with CSW once a month.

In December 2023, CSW gave Father bus passes, a referral to Turning Point for therapy, and referrals to two organizations for housing. DCFS advised the court that Father just made contact and had not progressed toward meeting case plan goals. It recommended termination of parental reunification services.

In a report for the January 2024 hearing, DCFS wrote that J.P. continues to live with PGM, who provides for all his needs. She planned to enroll J.P. in kindergarten if he remains placed with her. Mother participated in twice-weekly counseling. She had a new job. DCFS opined that Mother's recent arrest demonstrated limited insight or change, making her unable to provide J.P. with a safe and stable home.

Father did not comply with court orders or the case plan. He belatedly sought out CSW at the end of November 2023 and obtained referrals for housing and therapy, and bus passes. CSW scheduled a drug test for Father, but when he arrived at the lab, he lacked identification and was unable to test. He had a

monitored visit with J.P. on December 15, 2023. He was homeless but did not want shelter services.

Father's lack of engagement meant that safety issues were unaddressed. He did not demonstrate his ability to overcome the problems that led to J.P.'s dependency. He had minimal contact with J.P. and was unmotivated to comply with court orders. DCFS feared for five-year-old J.P.'s physical and emotional safety if he were released to Father. Father had not tested for drugs but has a history of substance abuse. He could not provide J.P. with a consistent, safe, and stable environment.

J.P. said he missed his parents and seemed happy during their visits. He adapted well in PGM's home, and she communicates responsibly with DCFS, but she no longer wished to be J.P.'s legal guardian. DCFS recommended termination of family reunification services.

Father did not appear at the hearing on January 2, 2024, despite having notice from his attorney. Counsel for J.P. believed that services should be terminated. Though Mother visited J.P. regularly, her arrest for grand theft during the dependency case showed limited insight and inability to provide J.P. with a safe and stable home. Father was not enrolled in services and did not test for drugs.

DCFS noted that PGM's unwillingness to serve as J.P.'s guardian was caused by Mother's adversarial behavior. Father has been "disengaged with his very simple case plan" since the inception of the case. When CSW finally saw Father at PGM's home, by chance, he appeared to be under the influence. PGM allowed Father to visit J.P. while in a state of apparent intoxication and would not control Father if he lived with her, placing J.P. at high risk.

Mother argued that she was progressing in counseling following her most recent stint in prison. She tested negative for drugs for the probation department and in her transitional living program. Father requested custody of J.P., in PGM's home, or additional reunification services.

The court found that DCFS made reasonable efforts to return J.P. to a safe home and finalize his placement. Mother made substantial progress to alleviate the causes leading to J.P.'s removal; she was given additional reunification services and monitored visits. Father's progress was "unsubstantial." The court found, "Father has received all reunification services to which he is entitled." It terminated his services because he "has not been engaged in services, and he . . . appears to be under the influence and struggling with sobriety at this time."

## DISCUSSION

### 1. Termination of Reunification Services

Father contends that the court abused its discretion by ending his reunification services at the 18-month hearing. He agrees that discretion is abused if the court " ' "exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) We determine whether the order is supported by substantial evidence. (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028.)

For J.P., who was three and a half years old when he was removed from parental custody, "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care." (§ 361.5, subd. (a)(1)(A).) Services "may be extended up to a maximum time period not to exceed 18 months after the date the child was

9

originally removed" from custody.  (*Id.,* subd. (a)(3)(A).)  The court extended services for Father and Mother to 18 months.

At the 18-month hearing, the court may extend services upon a showing that it would serve the child's best interests and the parent is "making significant and consistent progress in establishing a safe home for the child's return."  (§ 366.22, subd. (b)(1).)  There must be "a substantial probability that the child will be returned to the physical custody" of the parent within the extended period; consistent and regular visits with the child; and the parent must make "significant and consistent progress in the prior 18 months in resolving problems that led to the child's removal."  (*Id.,* subd. (b)(3)(A)–(B).)  Eighteen months is generally the outer statutory time limit for services.  (*In re Damian L.* (2023) 90 Cal.App.5th 357, 371.)

After reviewing the entire case history, we conclude that substantial evidence supports the juvenile court's findings, and its order terminating Father's reunification services was not an abuse of discretion.  When the hearing was held in January 2024, 19 months after J.P. was removed from parental custody, Father had made no progress to resolve problems leading to dependency jurisdiction.  He was not receiving treatment.  His visits with J.P. were sporadic.  J.P.'s attorney opposed further services because Father was not in therapy or testing for drugs.

Father optimistically opines that he "met the challenge" of engaging in the case plan.  The record does not support his view. From the time he was released from prison in 2022 until services ended in 2024, Father squandered the opportunity to fulfill a simple case plan requiring participation in counseling and drug testing.  No onerous requirements were imposed, such as a year-long parenting class or drug treatment programs.

10

Only a minimal effort was needed, but Father was unwilling to do even the minimum, despite meeting with the CSW and receiving resources to find housing, get transportation, and have therapy. He said he felt no responsibility for the dependency proceeding, even if his incarceration prevented him from taking custody of J.P. when Mother was arrested. He had no insight into the impact of his conduct on his young son. Counseling appointments were made, but Father did not show up. He blamed everyone but himself for his situation.

Father had ample time to demonstrate his desire to comply with court orders and ability to transcend his history of criminality and substance abuse. Instead, he waited until the eve of the 18-month hearing to exhibit a newfound interest in the case. The record discloses no possibility that Father can provide J.P. with a safe and stable home in the foreseeable future.

CSW had a chance meeting with Father in November 2023. She saw that he was "jittery" and appeared to be under the influence of drugs. Moreover, PGM said that J.P. would not be safe with Father because Father "is using drugs."

Father discounts DCFS's evidence about recent drug use because it appeared in a last-minute report. However, he did not object or attempt to deny its truth below. Father forfeited his right to challenge the evidence on appeal. The court credited the evidence, finding that Father is "struggling with sobriety at this time." We cannot reweigh the evidence or substitute the juvenile court's findings with our own. (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.) Father could have undergone drug testing to refute CSW's and PGM's statements about apparent drug abuse, but he chose not to test. The court could reasonably

11

infer that Father's failure to appear for counseling or drug tests can be attributed to drug use.

Father writes that refusing to extend services for six more months exceeds the bounds of reason because the case was continued for Mother to receive additional services while she participated in the case plan. However, "the court does not consider the parents as one unit, but instead treats each of them on his or her own merits." (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 877.) " 'In deciding whether to terminate the services of one parent who has failed to participate or make progress toward reunification, the court is not constrained by a consideration of the other parent's participation in services.' " (*Ibid.*; *In re Jesse W.* (2007) 157 Cal.App.4th 49, 59–60 [court need not continue services for one parent when reunification services continue for the other parent]; *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651 [court has discretion to terminate services for one parent even if ordering services for the other parent].)

### 2. Compliance With ICWA

Father challenges the court's finding that there is no reason to know that J.P. is an Indian child. He seeks remand for the court to order DCFS to conduct further inquiry into Father's family history. (§ 224.2.) We take judicial notice that on July 2, 2024, the court ordered DCFS "to follow up and conduct an ICWA inquiry for father and his relatives," "inquire with all appropriate relatives" about possible Indian ancestry, and report on its ICWA inquiry. The court also ended J.P.'s foster placement and returned him to Mother.

DCFS argues that Father's ICWA claim is moot, in light of the court's July 2024 order. "A reviewing court must ' "decide on

12

a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.)  We " ' "decide actual controversies." ' " (*Ibid.*)  A case becomes moot when superseding events make it impossible to grant the appellant any effective relief because there is no "ongoing harm."  (*Ibid.*)

There is no actual controversy to decide.  The ICWA inquiry Father seeks on appeal is underway, perhaps even completed.  We cannot direct the court to issue an order when it has *already issued* that order.  We decline Father's invitation to exercise discretion to address a moot issue.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.


13