Filed 5/6/25  In re A.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> R.S., <br><br> Defendant and Appellant. | F088690 <br><br> (Merced Super. Ct. Nos. 23JP-00146-A, 23JP-00146-B) <br><br><br> **ORDER MODIFYING OPINION** <br> [CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on April 21, 2025, be modified as follows:

1. On page 13, under "DISPOSITION," the sentence beginning "The juvenile court's orders" is deleted and replaced with:

   This appeal is dismissed.

Except for the modification set forth, the opinion previously filed remains unchanged.  This modification changes the judgment.

FRANSON, A.P.J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.

Filed 4/21/25  In re A.S. CA5 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.S.,<br><br>Defendant and Appellant. | F088690<br><br>(Super. Ct. Nos. 23JP-00146-A, 23JP-00146-B)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Franson, Acting P. J., Peña, J. and Meehan, J.

Appellant R.S. (father) is the father of A.S. (born in 2011) and T.S. (born in 2013) (collectively, the children), who are the subjects of this dependency case. Father appeals from the juvenile court's September 10, 2024 orders at the Welfare and Institutions Code section 366.26[1] hearing selecting legal guardianship with maternal relatives as the permanent plan and denying his request for visitation with the children. On that same date, the court also denied the paternal grandmother's request for de facto parent status and for placement.

After reviewing the juvenile court record, father's court-appointed counsel informed this court she could find no arguable issues to raise on father's behalf. This court granted father leave to personally file a letter setting forth a good cause showing that an arguable issue of reversible error exists. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 844.)

Father filed a letter brief arguing that the requests of the children that they live with paternal grandmother were not considered; that it is detrimental for the children to lose contact with father; and that the legal guardians have refused to work with paternal grandmother and extended family on visitation. The letter concludes by asking that this court "consider the children's wishes in allowing contact and visitation with [paternal] grandmother … and father." We conclude father fails to set forth a good cause showing that any arguable issue of reversible error arose from the hearing. (*In re Phoenix H.*, *supra*, 47 Cal.4th at p. 844.) Consequently, we dismiss the appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

**Referral and Detention**

On October 8, 2023, the Merced County Human Services Agency (agency) received a call from law enforcement in response to a murder investigation. The

---

[1] All further statutory references are to the Welfare and Institution Code unless otherwise stated.

children's mother was deceased and father was being taken to the hospital. Law enforcement released the children to the agency.

That same day, the agency spoke to paternal grandmother, who reported ongoing domestic violence between mother and father. Paternal grandmother also reported father had problems with alcohol abuse and had previously been in a rehabilitation facility in 2022. Paternal grandmother had been with the children that day, shopping and going out to eat, and when they returned home, mother and father were gone.

The children were placed into foster care. While paternal grandmother was considered for placement, the agency was unable to clear her for emergency placement.

Father was released from the hospital, arrested, and booked into the local jail the following day, with criminal charges including murder.

The agency filed a section 300 petition on October 10, 2023, alleging the children were described by section 300, subdivisions (b)(1) and (g), due to mother being deceased; father's perpetration of domestic violence and prior arrests for the same; father's untreated alcohol abuse; father's incarceration and murder charge; and the lack of a viable safety plan for the children with relative/nonrelative extended family members. Attached ICWA-010 forms indicated no reason to believe the children were or are Indian children, as reported by paternal grandmother.[2]

Father refused to be transported from jail and was therefore not present at the detention hearing on October 11, 2023. Paternal grandmother, paternal step-grandfather, maternal aunt Angelina, and a 15-year-old maternal half sibling were present at the hearing. All relatives except paternal step-grandfather were asked about Indian heritage and the juvenile court concluded the Indian Child Welfare Act (ICWA) did not apply.

---

[2]     Father later submitted an ICWA-020 form stating he had no known Indian ancestry.

The juvenile court found that the agency made a prima facie case that the children came within section 300, subdivisions (b)(1) and (g), and ordered them detained. While paternal grandmother requested placement, the court informed her it could not place the children with her that day, but asked the agency to clear a relative home for the children as soon as possible. A jurisdiction and disposition hearing was scheduled for November 1, 2023.

**Jurisdiction and Disposition**

Father appeared at the November 1, 2023 hearing and again indicated he had no known Indian ancestry. The juvenile court again found ICWA inapplicable. The jurisdiction hearing was rescheduled to November 29, 2023, as the agency had not yet filed its report.

At the November 1, 2023 hearing, the juvenile court suspended all communication between the children and paternal grandmother, as the court had been provided information that paternal grandmother was discussing inappropriate information with the children. The maternal aunt caregiver, who was present at the hearing, was instructed not to allow the children any unsupervised, unauthorized communication with any relative or friend without permission from the agency. The court ordered the agency to follow up on information it received about one of the children's possible marijuana use.

Father requested the juvenile court authorize telephone calls for him with the children, but the court stated it would address that issue at the continued hearing. In the meantime, the court suspended all contact between father and the children due to the criminal case that brought the matter into the dependency court.

At the November 29, 2023 hearing, paternal grandmother requested visitation with the children. The juvenile court ordered that the visits remain suspended pending further review at the continued hearing now set for January 3, 2024.

The agency's report prepared for the jurisdiction and disposition hearing recommended that father not be offered reunification services pursuant to section 361.5,

subdivision (e)(1),[3] and that the juvenile court set a section 366.26 hearing to select a permanent plan for the children. The agency further recommended that the court order monthly communication in the form of letters and photographs between father and the children when the children were ready and if such communication was not detrimental to them. The agency planned to schedule supervised monthly visits between the children and grandparents if not detrimental to the children.

The children, who were placed with maternal aunt, were interviewed and reported mother and father consumed alcohol multiple times a week, which caused them to become " 'a whole different person' " and engage in arguing. A.S. reported not seeing any physical altercations between mother and father as he would go outside when they argued. He stated that he wished to stay with maternal aunt and did not wish to return home. T.S. reported no domestic violence between mother and father, but also said she was outside and did not really know what was happening. She felt safe with maternal aunt, but did not know where she wanted to live.

Father agreed to participate in an interview on December 4, 2023. He reported some past criminal history of domestic violence, but that all charges were dropped. He admitted to recently being arrested and charged with the murder of mother. Father admitted having an alcohol issue and stated he was drinking and blacked out on the day mother died. He had previously participated in a rehabilitation program in Mexico from November 2022 to January 2023. Father described several instances of domestic violence and that the children at times had tried to intervene. Father did not know why the agency was involved and said that his pending criminal case should not make a difference in the children's case because he was innocent until proven guilty and had not been convicted.

---

[3] Section 361.5, subdivision (e)(1) provides, inter alia, that if a parent is incarcerated, the court shall order reunification services unless it finds by clear and convincing evidence that those services would be detrimental to the children.

The agency's report detailed police calls from mother and father's address, including a suicide attempt by father, a violation of a restraining order, and three domestic violence calls between July 2022 and July 2023. The next call occurred on October 8, 2023, the date on which mother succumbed to multiple stab wounds.

The agency's report stated that paternal grandmother's home did not clear emergency relative placement on October 10, 2023, as one member of the household did not clear the criminal/child welfare portion of the screening process. The agency submitted a referral to the resource family approval unit for processing paternal grandmother's placement request through the standard process. Father stated that he wanted the children placed with paternal grandmother.

Father appeared at the January 3, 2024 jurisdiction hearing via video. Paternal grandmother appeared in court with retained counsel Retained counsel stated that he was also representing father in a civil nature outside of the dependency proceedings, but was told by the juvenile court that he was not allowed to act as co-counsel for father in the dependency case. The court declined to lift the no contact order between paternal grandmother and the children, but asked the agency to look into it.

After paternal grandmother and her counsel were excluded from the hearing, father submitted on the jurisdictional issues and requested a contested hearing on disposition. The juvenile court found the allegations of the section 300 petition true, the children to be juvenile dependents, and ordered the children removed from father's custody. The court did not lift the no contact order between father and the children pending the next hearing. A contested disposition hearing on whether reunification services should be bypassed was set for February 27, 2024.

Father was not present at the February 22, 2024 readiness conference, but counsel represented that father would not be contesting the agency's recommendations.

Father was present at the hearing on February 27, 2024, at which time he waived his right to a contested disposition hearing, requested supervised phone calls with the

6.

children, and placement of the children with paternal grandmother. The juvenile court bypassed reunification services for father, finding that providing such services would be detrimental to the children. It found the current relative placement necessary and appropriate, and continued to order no contact for the children with father and paternal grandmother. The court requested a court-appointed special advocate (CASA) for the children.

A section 366.26 hearing was set for June 20, 2024.

**Paternal Grandmother's Request for De Facto Parent Status, Petition to Change Placement, and Challenging the Relative Placement**

Concurrent to the jurisdiction and disposition hearings for father, several other matters were filed by paternal grandmother: a request to be declared a de facto parent; a section 388 petition to change the placement from maternal aunt to paternal grandmother; and a motion to challenge the relative placement pursuant to section 361.3. All were scheduled for April 9, 2024, and then, over the course of numerous continuances, to July 30, 2024, which eventually coincided with the section 366.26 hearing.

Counsel for the children filed an opposition to paternal grandmother's request for de facto status, indicating that paternal grandmother lived two hours away from the children from 2018 through 2023 and saw them only every other weekend but never assumed a day-to-day role in their lives.

The agency filed an opposition to paternal grandmother's request for de facto parent status and placement of the children in her home. The agency argued paternal grandmother did not meet the criteria to be designated a de facto parent under California Rules of Court, rule 5.502(1), and placement with her would not be in the children's best interest. The agency detailed several phone calls between paternal grandmother and father between October 2023 and April 2024. The agency informed paternal grandmother that there was to be no communication between father and the children on October 11, 2023. On October 14, 2023, paternal grandmother expressed knowledge of that directive

with father, and yet she allowed phone calls between the children and father on several occasions during early unsupervised visits between paternal grandmother and the children. During one phone call, T.S. broke down and could not speak due to crying; during another call, father used profanity with A.S. and asked if he was going to " 'do me like that' " by spending time with the child's maternal half sister.

The agency filed a report pursuant to section 361.3 in which it recommended the children remain in maternal relative placement and that the juvenile court deny paternal grandmother's request for placement, as paternal grandmother was aware of ongoing domestic violence in the home since at least 2020 and knew about father's substance abuse issues, but did not file for guardianship of the children or attempt to remove them from mother and father. Paternal grandmother had also allowed the children to speak to father over the telephone after they were detained.

The agency reported that the children were doing well in the placement with maternal aunt and uncle, and were receiving services. A.S. expressed a desire to stay with maternal aunt as he feared paternal grandmother would hinder communication with his mother's side of the family. T.S. stated she liked living with maternal aunt and uncle, but would like to live with paternal grandmother because she was more familiar with her. She also said she was not opposed to staying where she was.

The social worker met with father, who said he wanted the children moved to paternal grandmother's home, for her to have legal guardianship of the children, and to have the children returned to him if he is able to "beat" his criminal case. Father claimed maternal aunt and uncle engaged in criminal behavior, used drugs, and only took placement of the children for the money, allegations which the agency determined to be unfounded. Maternal aunt and uncle had met the criteria for emergency placement back in October 2023, thus allowing placement of the children with them when the children were detained.

Paternal grandmother's resource family approval remained in progress as she had not yet completed the requirements. The agency was concerned with paternal grandmother's ability to keep the children safe from father.

On May 30, 2024, the juvenile court held a review of case status hearing and granted paternal grandmother's request for written opinion from the children's therapist regarding contact with paternal grandmother and father. The court also approved a request from the agency to administer psychiatric medication to A.S. on an emergency basis to treat his posttraumatic stress disorder and sleep issues.

At a status review hearing on June 13, 2024, the juvenile court again denied father and paternal grandmother's requests for visitation, after counsel for the children stated she had spoken to A.S.'s therapist, who recommended against visits.

**De Facto Parent Request and Relative Placement Hearing**

On July 30, 2024, the juvenile court first addressed paternal grandmother's request for de facto parent status. Paternal grandmother testified at the hearing, and the court received into evidence a ledger showing paternal grandmother's rental of a different home for two months beginning in October 2023. A deputy sheriff testified in order to authenticate jail call recordings between father and paternal grandmother.

The hearing was continued to September 10, 2024, at which time paternal grandmother concluded her testimony. The juvenile court noted that father had been bypassed for reunification services and therefore, had very little say, if any, as to the children's placement. The court did not find that paternal grandmother provided a regular basis for the substantial care necessary to elevate her to de facto parent status and did not act as a parent to the children on a day-to-day basis, and denied her request.

As for paternal grandmother's request for placement, the juvenile court concluded that the only reasons to remove the children from their current placement would be because A.S. was not thriving and T.S. said she would rather live with paternal grandmother, although she was not opposed to staying where she was. The court noted

9.

paternal grandmother's admission that father had gang involvement as a teenager, and that A.S.'s behavior issues predated his detention. Since the children had gone through a very traumatic experience, the court did not think A.S.'s behavior was due to maternal aunt and uncle's care, and it refused to separate the siblings.

Addressing the section 361.3 relative placement factors, the juvenile court noted that one factor outweighed all the others: the fact that mother was murdered, which father was accused of, and that paternal grandmother maintained deep ties and connections to father. The court denied paternal grandmother's request for change of placement, stating that it did not find credible paternal grandmother's testimony that she could divest herself from father's control, and she could not therefore provide the children with a safe, secure environment.

**Section 366.26 Report and Hearing**

In its June 20, 2024 report in anticipation of the section 366.26 hearing, the agency recommended legal guardianship with maternal aunt and uncle and that dependency be dismissed. The report indicated that the children were not generally adoptable due to their older age, they were receiving mental health services, and A.S. exhibited specific behaviors affecting his progress in school. The report also noted maternal aunt and uncle were unwilling to adopt the children and one of the children had expressed a preference for legal guardianship over adoption. The agency recommended proposed orders that removal of the children from maternal aunt and uncle, whom they had been placed with since October 11, 2023, would be detrimental to their wellbeing, and that father have supervised visitation only if in the children's best interests. Paternal grandmother's resource family approval application was still listed as pending.

The report repeated conversations with father in which he stated he wanted the children placed with paternal grandmother in legal guardianship. It also repeated statements from A.S. that he wanted to remain in maternal aunt and uncle's home and be adopted by them. In May 2024, A.S. had attempted suicide by ingesting medication he

10.

found in some of father's possessions. He was placed on a section 5150 hold and subsequently prescribed psychiatric medication. He later stated that he felt loved and cared for by maternal aunt and uncle, especially after his suicide attempt. The report repeated the statements of T.S. that she would like to live with paternal grandmother, but was not opposed to remaining with maternal aunt and uncle.

The maternal aunt and uncle received criminal and child welfare history clearance for foster and adoption certification from the resource family team.

The contested section 366.26 hearing was scheduled for July 30, 2024, in order to accommodate father's criminal hearing schedule. Father subsequently stated he would submit on the section 366.26 recommendation, but the only issue going forward was his request for phone calls with the children.

The section 366.26 hearing did not take place until September 10, 2024, at which time the juvenile court found that removal of the children from their current relative placement would be detrimental to their wellbeing and ordered them into a permanent plan of legal guardianship with the maternal relative caregivers.

As for father's request for visitation, the juvenile court concluded that, due to the circumstances in which father was alleged to have murdered mother, the children should not have contact with father, including any phone conversations, at this time, but determined to leave the issue open in the future if the children expressed an interest in contact with father. The court ordered no contact or visitation, direct or indirect, between father and the children, subject to revision or modification at a later date, if appropriate, by the family law court.

A hearing was set for October 2, 2024, to confirm that legal guardianship had been effected and letters of guardianship had been signed, which would allow the court to terminate dependency at that time.

Father filed a notice of intent to file writ petition on September 18, 2024, and this court deemed the notice of intent a notice of appeal on September 26, 2024.

11.

## DISCUSSION

An appealed-from judgment or order is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is the appellant's burden to raise claims of reversible error or other defect and present argument and authority on each point made. If the appellant fails to do so, the appeal may be dismissed. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

By the time a case reaches the section 366.26 hearing, the juvenile court has determined, based on extensive evidence, that the dependent child or children cannot be safely returned to the parent's custody. At a section 366.26 hearing, if the court orders a legal guardianship for the children, as it did here, "[t]he court shall also make an order for visitation with the parents or guardians unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child." (§ 366.26, subd. (c)(4)(C).) By adding this statutory provision, "the Legislature made clear its intent to require juvenile courts to make visitation orders in both long-term foster care placements and legal guardianships." (*In re M.R.* (2005) 132 Cal.App.4th 269, 274.) A court accordingly has a statutory obligation to make an order for visitation at a section 366.26 hearing unless it affirmatively finds that visitation with the parent would be detrimental to the child. (§ 366.26, subd. (c)(4)(C); see also *M.R.*, at p. 274 [under section 366.26, "the trial court was required to make a visitation order unless it found that visitation was not in the children's best interest"].) "Detriment includes harm to the child's emotional well-being." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.)

Father, in essence, is contending the juvenile court failed to consider the detriment a *lack* of visitation would have on the children. Father provides no authority for his argument. Nevertheless, we have reviewed the record as it relates to the section 366.26 hearing and visitation and find no error occurred here.

12.

At the time of the section 366.26 hearing, a no visitation order was in place, based on an earlier and continued finding of detriment to the children if visitation were to occur. The juvenile court had before it evidence that earlier phone calls between father and the children (which paternal grandmother had allowed despite a directive to the contrary) had resulted in one phone call in which T.S. had broken down and could not speak due to crying; and that during another call, father used profanity with A.S. and asked if he was going to " 'do me like that' " by spending time with the child's maternal half sister. At a status review hearing on June 13, 2024, the court again denied father's requests for visitation after counsel for the children stated she had spoken to A.S.'s therapist, who recommended against visits. And at the September 10, 2024 section 366.26 hearing, the court addressed father's request for visitation and concluded that, due to the circumstances in which father was alleged to have murdered mother, the children should not have contact with father, including any phone conversations, at that time, but determined to leave the issue open in the future if the children expressed an interest in contact with father. The court ordered no contact or visitation, direct or indirect, between father and the children, subject to revision or modification at a later date, if appropriate, by the family law court.

There was substantial evidence to support the denial of visitation. (See *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028 [on substantial review, we " 'review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders' "].) We reject father's claims to the contrary.

## DISPOSITON

The juvenile court's orders are affirmed.

13.